## TAYLOR *v.* THE STATE.

No. 8278. December 16, 1931. Rehearing denied January 16, 1932.

*Arnold, Arnold & Gambrell,* for plaintiff in error.

*John A. Boykin, solicitor-general, J. W. LeCraw,* and *William Schley Howard,* contra.

Beck, P. J. Walter C. Taylor was tried on an indictment containing five counts charging bribery, and was convicted on counts numbered 4 and 5. He was found not guilty on the first, second, and third counts. Counts 4 and 5 on which the defendant was convicted dealt with the same alleged transaction. Count 4 alleged that Taylor, on the 13th day of October, 1925, received from Mike Ellman, of the firm of Clein & Ellman, the sum of $400 to influence him in his official behavior as clerk of council of the City of Atlanta, which office was then held by Taylor, in the matter of the issuance of a license by the City of Atlanta to the firm of Clein & Ellman, which firm was then and there conducting an auction jewelry business in the City of Atlanta, this fact being known to

Taylor; the purpose of said payment and delivery of money to Taylor by Ellman being, in part, to influence the official behavior of said Taylor in causing him not to enforce against Clein & Ellman a certain license-tax ordinance of the City of Atlanta, which provided that a license tax of $1,000 must be paid by any person or firm which engaged in the said city in the business of "selling watches, clocks, and jewelry at auction." Count 5 charged that Taylor, on the 13th day of October, 1925, unlawfully received from Mike Ellman, a member of the firm of Clein & Ellman, the sum of $100 to influence his official behavior in his office of clerk of council of the City of Atlanta; and that the purpose of the payment was, in part, to influence the behavior of Taylor in causing him not to enforce against the auction business of Clein & Ellman a license-tax ordinance of the City of Atlanta, which provided that license taxes shall be assessed and collected yearly from persons or firms doing business in the City of Atlanta, "upon auctioneers or vendue masters, where ad valorem taxes are paid, $60, and upon auctioneers or vendue masters where no ad valorem tax is paid, $240." The defendant filed a demurrer upon the grounds, first, that the indictment sets forth no offense under the laws of Georgia; second, the office of clerk of council of the City of Atlanta is not such an office at that the crime of bribery can be committed in respect thereto; third, that the act of the General Assembly of December 19, 1893, is unconstitutional; fourth, that the jewelers' auction ordinance passed in pursuance thereto is unconstitutional, and the ordinance requiring vendue masters to pay a license is invalid because discriminatory and unreasonable.

It is insisted that there was no authority in the City of Atlanta or in Taylor to exact the $1,000 license-tax prescribed for the selling of watches, clocks, and jewelry at auction, for the reason that the ordinance passed after the act of December 19, 1893, which provided that the mayor and council shall have authority, in their discretion, to require the payment of a registration tax not exceeding $1,000 per annum on the business of selling watches, clocks, and jewelry at auction; provided that when the registration tax on such business shall exceed $200 per annum, no ad valorem tax shall be charged to the dealer paying such registration tax on the stock carried by him; and provided further, that when such dealer is relieved from the payment of ad valorem tax on his stock, the

registration tax shall not in any case be less than the ad valorem tax on said stock would amount to. The act referred to is attacked as being in violation of certain specified portions of the constitution of this State.

The demurrers were overruled, and to this ruling the defendant excepted. A verdict of guilty was returned by the jury. A motion for a new trial was overruled, and to that judgment Taylor excepted.

■ There were grounds of demurrer other than those stated above, which it is not necessary to set forth specifically and in detail, but they will be covered by the rulings which follow. In the second ground of the demurrer the contention is made that the office of clerk of council of the City of Atlanta is not such an office as that the crime of bribery can be committed in regard thereto. This contention is not sound, in view of the statutes of this State relating to the crime of bribery. Section 270 of the Penal Code is as follows: "Bribery defined. Bribery is the giving or receiving any undue reward to influence the behavior of the person receiving such reward, in the discharge of his duty in any office of government or of justice." Section 271 is as follows: "Punishment. If any person shall, directly or indirectly, give or offer to give any money, goods, or other bribe, present, or reward; or give or make any promise, contract, or agreement for the payment, delivery, or alienation of any money, goods, lands, or other bribe; or use any promises, threats, persuasions, or other like sinister, unfair, or fraudulent practices in order to obtain or influence the opinion, judgment, decree, or behavior of any member of the General Assembly or officer of this State, referee, or arbitrator, in any matter or cause depending, or which shall depend before him, such person, and the officer, referee, or arbitrator, who shall accept or receive such bribe, shall be guilty of a misdemeanor." In *Payne* v. *State,* 153 *Ga.* 882 (113 S. E. 446), it was held that it was the intention of the legislature that these two sections should be construed together, and the court held that, so construed, section 271 provides the penalty for the offense of bribery as defined in both sections. It was held further, that a policeman of the City of Atlanta was appointed by a board of the municipal government under legislative authority authorizing the creation of that board, and that therefore he came within the meaning of "office of government or of justice" and "officer of this State," under those two sections of the Penal

Code. This court cited, in this connection, the note to the case of Schmitt *v.* Dooling, 36 L. R. A. (N. S.) 881 (145 Ky. 240, 140 S. W. 197, Ann. Cas. 1913B, 1078); 3 Words & Phrases (2d ed.), 713. By the same reasoning, in view of the duties of the clerk of council of the City of Atlanta, which have their source in an ordinance authorized by the city's charter, the clerk of council of the City of Atlanta comes within the broad meaning of the term "any office of government." It necessarily follows from this ruling that the charge in the indictment that the clerk of council of the City of Atlanta received money to influence his official conduct charges a crime, under the sections of the Code referred to.

■ We need not enter upon a consideration of the question as to whether the ordinance imposing the $1,000 license-tax was invalid and void because unconstitutional, or because based upon an unconstitutional statute; for the reason that this was a question which the clerk of council could not raise if he received money or other things of value to influence his official conduct in regard to that ordinance. If the city council regularly passed this ordinance and by it created duties for the clerk of council to perform, and he received money which was paid to influence his official conduct in regard to the ordinance, the invalidity of the ordinance could not be urged by him as a defense. It may be true that if the clerk failed to enforce the $1,000 license tax against Clein & Ellman because of a belief that the tax was unconstitutional, his failure to enforce it would not be necessarily a dereliction of duty, and would not bring upon him any of the penalties denounced against bribery. His conduct in such a case would not be influenced or affected by any bribe. The judge recognized this, and charged the jury: "I instruct you that if you believe that the defendant, believing that the ordinance requiring the $1,000 license was void and not enforceable, or believing that he had been enjoined by a court of competent jurisdiction from enforcing said ordinance, refrained from enforcing the ordinance, and from collecting the license, because he thought it void, or that he had been enjoined, this would not make him guilty of bribery as charged in any count of this indictment." But under the state of facts as charged in the indictment, wherein it was set forth that Taylor received the $400 as a bribe to influence his official conduct and cause him not to enforce the $1,000 tax against Clein & Ellman, we have a case where the

conduct of the defendant in his official capacity as clerk of council was involved and was influenced by the payment of a bribe; and this is bribery under our statute. Certainly the clerk has an official duty resting upon him in view of the existence of the ordinance, a duty in connection with that ordinance. We find this language in the brief of counsel for plaintiff in error: "In fact, we contend that since the ordinance was void, it was the legal duty of the clerk to refuse to issue a license thereunder, and to refuse to enforce the same and to refuse to issue an execution against the parties for the amount of the tax referred to in said ordinance, and to refuse to take any other steps provided by the ordinance tending toward the enforcement of said tax provision and the collection of the tax." And if he did have any duty, as we have said, in regard to this ordinance or growing out of the ordinance, if he took money to secure certain action or inaction in regard to it, or took money that would influence his views and construction of the ordinance, that would be receiving money to influence his official conduct. "Nor is a public officer to be acquitted of the charge of bribery because that which he agreed to accept a bribe for doing was no more than he was legally bound to do." 4 C. J. 405. Again, "It is generally held that to constitute the offense of attempted bribery it is immaterial whether the official action sought to be influenced be right or wrong." Daniels v. U. S., 17 Fed. (2d) 339, 343. At common law, bribery was the voluntary giving or receiving of anything of value in unlawful payment of an official act done or to be done. And the Supreme Court of West Virginia, in the case of Weil v. Black, 76 W. Va. 685 (86 S. E. 666), held: "To constitute the offense of attempted bribery, it is immaterial whether the official action thereby sought to be influenced was officially right or wrong." The same doctrine is laid down in People v. Jackson, 121 App. Div. 856 (106 N. Y. Supp. 1046).

In the note appended to the case of State v. Ellis, 33 N. J. 103 (97 Am. D. 707, 713), it is said: "Among ancient peoples, and even among the Romans, the giving of rewards and emoluments to public officers, and especially judicial officers, was tolerated and even encouraged; and without such inducements no audience could be had. See 4 Bl. Com. 139. The enlightened civilization of the present age quickly apprehended the danger of any such custom; and hence the fiat of the common law against it. And in

modern times, the heinousness of the offense becoming more apparent as the power of wealth increased, the crime has been in many cases made punishable as a felony. The reason of the rule of the common law, and the greater stringency of modern statutory law, is clear. The spirit of any democratic government is utterly abhorrent to anything which tends to corruption in the representatives of the people, or threatens the purity of the administration of the government. And as wealth and power may become powerful forces in this dangerous direction, the protection of equal rights among the people demands that a severe penalty be visited upon any member of the community who gives, or offers to give, anything of value to any representative of the community, whether executive, legislative, or judicial, and upon any such representative who receives, or offers to receive, any such reward as an inducement to official action." See also 4 R. C. L. 177-178, where the part of the note just quoted appears as a part of the text. And further discussing the history of bribery in 4 R. C. L. 179, it is said: "The general rule is that the purpose or object sought by the bribe may be anything within the scope of authority of the official bribed. . . Furthermore, if an executive officer receives money in consideration of his promise not to take official action against a certain class of offenders, he is guilty of bribery, and it is not necessary to prove that the offense was committed or that the officer failed to act." See also 4 Am. & Eng. Enc. L. (2d ed.) 908. In State v. Ellis, supra, it was said: "Offense of bribery is complete when offer of reward is made to influence the vote or action of an official, although in a matter not within the jurisdiction of the officer. . . Offer of money to member of common council of city, to vote in favor of an application for leave to lay a railroad-track along one of the streets of the city, is bribery, whether or not the common council had authority to make the grant, or the railroad company the power to avail itself of its benefits if made, or whether the offer was made before or after the application had been embodied in an ordinance or resolution introduced before the council." In that case the contention was made by the defendant that the city council had no power to grant the application, and that hence there could be no bribery. The court ruled adversely to this contention, upon the theory that since the councilman was an officer of the municipality, duly charged with the general duty of voting upon proposed ordi-

nances that came before the council, it was bribery to seek to influence the councilman corruptly, even though the measure in question was an invalid one and beyond the jurisdiction of the council. So, in the present case, Taylor was a duly constituted official of the City of Atlanta, charged with the general duty of enforcing the payment of license taxes by people engaged in various businesses in the city. The ordinances setting forth his duties in this respect are contained in the indictment, and are not dependent at all upon the dispute as to whether the $1,000 license tax on auction jewelers is constitutional or not. The subject of making certain people pay license taxes in Atlanta was one within the jurisdiction and scope of Taylor's general duties, as established by these undisputed ordinances. · When, therefore, the general council of Atlanta enacted the $1,000 license ordinance with reference to auction jewelers, this additional subject-matter came before Taylor to be dealt with along with his general duties of enforcing license tax payments, in general. If he decided the question of whether or not he would enforce this $1,000 tax ordinance on its merits, and uninfluenced by a payment of money by Ellman, there would be no bribery. But if his decision and conduct in this regard was influenced by $400 in money paid him by Ellman for the purpose of inducing him not to enforce the $1,000 tax ordinance, it would be bribery. See, in this connection, State v. Lehman, 182 Mo. 424 (81 S. W. 1118, 66 L. R. A. 490, 103 Am. St. R. 670).

We do not think that what we have ruled above is necessarily in conflict with the ruling in *Newman* v. *State,* 97 *Ga.* 367 (23 S. E. 831). In that case it was said: "Under the law as above announced, the alleged appeal to a jury in the justice's court was void, and consequently there was no case lawfully pending in that court between the parties with reference to which the offense of attempting to bribe the presiding justice could be committed." That was an ·attempt to bribe with reference to a case that did not exist on the appeal. In State ex rel. New Orleans Canal & Bkg. Co. v. Heard, 47 La. Ann: 1679 (18 So. 746, 47 L. R. A. 512), it was said: "Executive officers of the State government have no authority to decline the performance of purely ministerial duties which are imposed upon them by a law, on the ground that it contravenes the constitution. . . Laws are presumed to be, and must be treated and acted upon by subordinate executive functionaries as, con-

stitutional and legal, until their unconstitutionality or illegality has been judicially established. Under our system of government it was certainly never intended by its founders that an executive officer should nullify a law by neglecting or refusing to act under it." Cooley in his work on Constitutional Limitations, 163, says: "It is the consensus of the best judicial opinion that a statute is assumed to be valid until some one complains whose rights it invades." And this State has recognized this rule as stated by Cooley, and in the decisions of many courts of this country it is also recognized as sound. In People ex rel. Atty.-Gen., *v.* Salomon, 54 Ill. 39, the Supreme Court of Illinois said: "The law under which this additional tax was imposed had passed the legislature under all the forms of the constitution, and had received executive sanction, and became, by its own intrinsic force, the law to you, to every other public officer in the State, and to all the people. You assumed the responsibility of declaring the law unconstitutional, and at once determined to disregard it, to set up your own judgment as superior to the expressed will of the legislature—asserting, in fact, an entire independence thereof. This is the first case in our judicial history in which a ministerial officer has taken upon himself the responsibility of nullifying an act of the legislature for the better collection of the public revenue, of arresting its operation, of disobeying its behests, and placing his own judgment above legislative authority expressed in the form of law. To the law every man owes homage—'the very least as needing its care, the greatest as not exempted from its power.' To allow a ministerial officer to decide upon the validity of a law would be subversive of the great objects and purposes of government; for if one such officer may assume infallibility, all other like officers may do the same, and thus an end be put to civil government, one of whose cardinal principles is subjection to the laws." This doctrine has been repeatedly laid down by various courts of this country. In State ex rel. A. C. L. Ry. Co. *v.* State Board of Equalizers, 84 Fla. 592 (94 So. 681, 30 A. L. R. 362), it was said: "In mandamus proceedings against a public officer, involving the performance of official duty, nothing can be inquired into but the question of duty on the face of the statute, and the ministerial character of the duty he is changed to perform. . . Every law found on the statute books is presumptively constitutional, until declared otherwise by the court, and

an officer of the executive department of the government has no right or power to declare an act of the legislature to be unconstitutional, or to raise the question of its constitutionality, without showing that he will be injured in person, property, or rights by its enforcement. ·. . Officers must obey a law found upon the statute books until in a proper proceeding its constitutionality is judicially passed upon." In State ex rel. v. Steele County, 181 Minn. 427 (232 N. W. 737, 71 A. L. R. 1190), the court said: "The authorities are in conflict. The better doctrine, supported by the weight of authority, is that an official so charged with the performance of a ministerial duty will not be allowed to question the constitutionality of such a law. This rule is based largely upon governmental policy. It rests upon the theory that the court should accept as final the acts of the legislature and discourage attacks upon them, except where necessary to protect the private interests of the individual asserting invalidity and peculiarly and particularly affected thereby. Officials acting ministerially are not clothed with judicial authority. To permit them to refuse to perform their duty on the ground that the commanding law is unconstitutional would be a dangerous practice, in that they who have only ministerial duties would be raising questions affecting the rights of third persons, while they themselves would have no direct interest in the question and could not in any event be made responsible." And in People v. Pitcher, 56 Colo. 343 (138 Pac. 509), it was said: "This case only demonstrates anew the wisdom· of the general rule that public officials, whose duty it is to carry out statutory directions, should not be permitted to raise the constitutionality of statutes. People v. Leddy, 53 Colo. 109, 111 (123 Pac. 824). As said in Ames v. People, 26 Colo. 83 (56 Pac. 656): 'The reasons for this rule are apparent. Public policy and public necessity require prompt and efficient action from such officers; and when intrusted with the assessment of taxes and the collection and disbursement of the revenue, they have no right to refuse to perform ministerial duties prescribed by law because of any·apprehension on their part that others may be injuriously affected by it, or that the statute prescribing such duties may be unconstitutional.'" The following cases are also in point: Estus v. State, 83 Okla. 181 (200 Pac. 1002·); State ex rel. v. McFarlan, 78 Mont. 156 (252 Pac. 805); Tincher v. Comm. ex rel. Shanks, 208 Ky. 661 (271 S. W. 1066); Goer v.

Taylor, 51 N. D. 792 (200 N. W. 898) ; State *v.* Cease, 28 Okla. 271 (114 Pac. 251, Ann. Cas. 1912D, 151) ; Braxton County Court *v.* State ex rel. Dillon, 208 U. S. 192 (28 Sup. Ct. 275, 52 L. ed. 450) ; Caffrey *v.* Okla., 177 U. S. 346 (20 Sup. Ct. 664, 44 L. ed. 799) ; Thoreson *v.* State Board of Examiners, 19 Utah, 18 (57 Pac. 175) ; State ex rel. *v.* Tyler, 64 Mont. 124 (208 Pac. 1081) ; State ex rel. Nicholls *v.* Shakespeare, 41 La. Ann. 156 (6 So. 592) ; Bassett *v.* Barbin, 11 La. Ann. 672 ; Threadgill *v.* Cross, 26 Okla. 403 (109 Pac. 558, 138 Am. St. R. 964). Throop on "Public Officers," 785-6, § 821, says: "But where the application for the writ [of mandamus] is made, on the ground that the officer has failed to perform a ministerial act which it was his duty to perform, the mandamus may direct the performance of the particular act, and specify the mode of performance, so as to conform to the law, and the right of 'the party, as determined by the court. . . So, a mandamus was granted, to compel the clerk of the quarter sessions to file and record resolutions of the school directors of a city, the court refusing to entertain the objection that the statute which made it his duty to do so was unconstitutional." In ex parte Winters, 10 Okla. Cr. 592 (140 Pac. 164, 51 L. R. A. (N. S.) 1087), it was said: "One can not hold himself out as an officer of the law and prostitute the public trusts and debauch the public conscience by soliciting and accepting bribes, and be exonerated by the courts of this State on the ground that he had no legal right to act in the capacity he assumed. If he is officer enough to solicit and accept a bribe, he is also officer enough to be sent to the penitentiary for his conduct." And there are numerous other authorities laying down the same doctrine; and we have concluded, upon the strength of these authorities, and upon reason, that Taylor could not raise the question as to the invalidity of these ordinances as a defense to the crime of bribery received by him to influence his official conduct in reference to the ordinances. As said above, if he had merely refused to enforce the ordinances because he conscientiously believed them unconstitutional, and for that reason alone, and accepted no bribe, a different case entirely would have been presented. But if he received money to influence his official conduct in regard to the ordinance or ordinances, he is guilty before the law.

The rulings in headnotes 3, 4, 5, and 6, require no elaboration.

■ In the 9th, 10th, 11th, 12th, and 13th grounds of the motion for a new trial error is assigned upon the admission of testimony of witnesses examined on behalf of the State, over the objection urged by the defendant that this testimony, as set out below, was irrelevant, inadmissible, incompetent, and highly prejudicial to the defendant's case:

A. Pizanti: "I operated a billiard and pool-room at 21 Marietta Street in August, 1929. I know Mr. Walter C. Taylor. I had a conversation with him about my license. That was at the Robert Fulton Hotel, across from the Cecil Hotel, on Luckie Street. Nobody went up to the room with me, but I had a friend of mine waiting for me downstairs, Jule Galanti. I met him once in the Flatiron Building—met Mr. Taylor there; met him there by chance. I had no date with him, but I had a date to meet him in the hotel. When I met him at the Flatiron Building we had a little talk together, and he told me it was no place to talk there, and he told me to come to the hotel; so I went the next day and talked to him at the hotel about my license—to give me my license. He told me there—he says, 'We can't talk very much here,' to meet him in the morning at the hotel, at 12 o'clock the next morning; so I went there the next day; he told me to come to that room. I think it was on the fifth floor. I don't remember exactly now, but I went up there two or three times. So when I went there at 12 o'clock the next day I found Mr. Taylor there by himself, and I told him about my place, and I told him there was no reason to close out my place, that there was no whisky sold there and no gambling, and I saw no reason for them taking my license away. Well, he told me, he says, 'It takes a lot of fire to burn a house. It takes fire to burn a house.' I asked him what he meant, and he says, 'It takes money to fix that thing,' and I paid him $200. I didn't pay it that day, but I paid it the next day. I went three times. I told him I didn't have the money; so I drew a check. Yes, sir, I paid money to the City of Atlanta. I paid it for the tax for one year. He told me the best way for me to do was to get a license, so they wouldn't bother me. This check for $216.15 is the check I gave to Mr. Taylor. I gave him this check to pay what I owed the City of Atlanta. I gave that in money—cash. That one there, I gave that before, and I gave him the money on Saturday. The meeting was supposed to be on Monday; the council was supposed to meet

on Monday; so I gave him the check before the council passed the resolution in my favor. Yes, I knew how to get to that room. I didn't call for anybody. I went myself to the room. I paid the $200 to him before I gave him the check. I gave him the $200 on Saturday, and I gave the check the next week, because the council met on Monday. I say, before I gave the check I gave him $200. The money was given on Saturday and the check a few days after, four or five days, after I got the license. I don't remember exactly the day of the month, but I can find it. Anyhow, it was a day or two before I gave the city this check that I paid him the $200. I then got a license. This [indicating] is the license I got. It was about July first I was supposed to get a license. I had been tied up so I couldn't carry on business about five weeks before I paid Mr. Taylor the $200. I don't remember the exact time, but I could find out. After I paid him that $200, a day or two afterwards, I got this license and paid the city the money. I paid the lunch license also. He asked me to give him $40 a month as long as he kept me off. Well, I was willing to do that, but business was so bad I didn't pay him. I agreed to pay that money, but I didn't pay it. He came to my place three or four times and asked for money, but I didn't give it to him. He came to my place and talked to me about the $40. We went outside and talked. He came in the front and went back the back way through an alley. The back end of my place runs out to the City Hall. There is an alley there between the Grant Building and the Palmer Building, from Broad to Forsyth."

Joe Galanti: "I am a shoemaker. I know A. Pizanti, who runs a pool-room. I loaned him some money in 1929. It was in the summer time, the latter part of July or the first part of August, and I went somewhere with him at that time. We were coming up Peachtree, and went Luckie Street to the Robert Fulton Hotel. I stayed down stairs and he went up stairs. Pizanti was up stairs with Taylor about half an hour I think, and he came back to me down stairs. I did not see Pizanti talking to Walter Taylor in the Robert Fulton Hotel. I think it was the day before. I loaned Pizanti the money after I saw him talking with Taylor, and before the trip to the hotel, and then I went along with him to the hotel."

Solomon Piha: "I operate a pool-room in Atlanta. I know W. C. Taylor, now. I know Jake Jacobs. I delivered some money

to Jake Jacobs—$200. At that time I did not have a pool-room license. I think I had been without a license about two and a half months. After I delivered this money to him, it was about ten days before I got a license and opened up and carried on my business as a pool-room operator. It was on Auburn Avenue that I let him have that money. That was in Fulton County. It was in 1924. I don't remember exactly what date, but I remember it. I think it was before noon about dinner-time. I think it was in March." Cross-examination: "I had not been in the pool-room business prior to that time. I had had the matter of getting a license up with the police committee of council three different times before I loaned this money. That was the police committee of council down at the police station. I was, trying to get the City Council of Atlanta to grant me a license to operate a pool-room. I had been before that committee three different times before this occasion Mr. Boykin was asking about. I never had talked to Mr. Taylor about it."

Jake Jacobs: "I have lived in Atlanta 32 years. I know Solomon Piha. Yes, he came to me in regard to getting a license to operate a pool-room on Walton Street. He was not open at that time. He turned over to me $300, and I turned it over to Mr. Taylor. I mean Mr. Walter C. Taylor. It was at 124 Auburn Avenue that I turned this money over to him. That is the Nu Grape Bottling Company's place. That was cash. Mr. Piha and his partner came to see me about this license. After I saw them I went to see Mr. Taylor. I went to see him and told him that these boys were trying to open, and that they had signed a lease for $500 a month, and that I knew the boys were of good character, and I did not understand why their application had been turned down. After having a conversation with him he said that he could fix it up for $500. I told him that they were poor boys and that they had invested everything they had, that they had about $11,000 invested in the place, and that one of the partners was in the hospital and about to die. I don't remember the name, I believe his name was Amiel, and he did die; and after I told him the circumstances he finally said that he could fix it up for $300, and I said that I would go back and see them, which I did, and I went back and told them, and they turned the money over to me, and I called Mr. Taylor, and he came to the place and I gave him the money, and

just after that the place was opened. I think it was around ten days or twenty days, but very shortly after that. I know that they got a license to open."

Witness James Prattes: "I paid some money to Walter C. Taylor in the matter of getting a pool-room license. In 1923 I rented a place at Broad and Alabama Streets. I tried to get a license to operate that pool-room, but I did not get the license. I was trying for two or three months to get a license. After I had been trying about a month, I went to Mr. Taylor at the old City Hall on Marietta Street, and paid him $50. I agreed to pay him $50 down and another $50 after he got it. Poulous was in partnership with me. He put up that half. I did not get the license. I asked him one or two times to give me back the $50, but he never did. He said he used the money for some reason at the city hall, I don't know what, and would not give me my money back. No, sir, none of this $50 that I gave Walter Taylor was for John Y. Smith. I gave him different money. I paid him $100, and was supposed to pay him $200 to get it."

Besides the objection above stated, this testimony was objected to upon the ground that it related to other transactions of which the defendant had been acquitted; that the same showed distinct and different alleged offenses; that the law, on the trial of one charged with a crime, did not allow evidence of alleged distinct and independent crimes to be admitted against him; and that there was such a difference between the transactions testified to by the witnesses and the case on trial, both as to the time and nature, that there could be no connection between them. The court did not err in admitting this evidence. While it related to other offenses than that for which the defendant was on trial, it was relevant as tending to show intent and system and to illustrate the methods and conduct of the defendant in reference to the particular acts of bribery for which he was on trial. "In bribery cases, evidence of similar offenses is frequently admitted to show intent, a plan or scheme to commit a series of crimes including the one for which accused is being tried, or the intimate and apparently confidential relations between the informer and the defendant; but evidence of other offenses which are not of a similar nature or character, and which do not tend to prove the bribery charge, is not admissible." 16 C. J. 595. In State v. Davis, 90 Ohio St. 100 (2) (106 N. E.

770), cited by Corpus Juris in a note to the foregoing, it is said: "In proving such corrupt intent, other similar offenses, tending to show the corrupt course of dealing of a public official, may be shown as tending to prove the specific corrupt intent charged in the indictment." In People *v.* Duffy, 212 N. Y. 57, 105 N. E. 839, L. R. A. 1915B, 103, Ann. Cas. 1915D, 176), it was said: "While evidence of other offenses is not usually admissible, evidence in this case of similar collections of 'hush money' by accused is admissible to show a general plan. For the same reasons, evidence of collection of bribes subsequent to one for which accused was being prosecuted is admissible." And many other cases to the same effect might be cited. In *York* v. *State,* 42 *Ga. App.* 453 (156 S. E. 733), the Court of Appeals of this State, in reference to a question like that we have before us, said: "Defendant objected to said evidence upon the ground that the transaction was not included in the indictment. It will be noted that this plan of York to use his office of councilman to promote his private interest was in keeping with his general plans of operation as shown by the indictment, particularly count 3 thereof; and such evidence was admissible to show intent and motive;" citing: *Frank* v. *State,* 141 *Ga.* 243 (80 S. E. 1016) ; *Williams* v. *State,* 152 *Ga.* 498, 521 (110 S. E. 286) ; *Chappell* v. *State,* 40 *Ga. App.* 502 (150 S. E. 450) ; *Goldberg* v. *State,* 20 *Ga. App.* 162 (2) (92 S. E. 957).

Nor is the contention sound that this evidence should have been ruled out because it relates to other alleged offenses for which this defendant had been previously tried and acquitted. While the defendant had been tried and acquitted of previous alleged offenses, and the verdict of not guilty may have indicated that there was not sufficient evidence to convince the jury beyond a reasonable doubt of his guilt, still that acquittal would not necessarily exclude the evidence, because that evidence may tend to illustrate the acts of the defendant as shown in the transaction for which he is now on trial, and may be considered in connection with the later evidence, and may throw a flood of light on this later evidence, though of itself insufficient to authorize a verdict of guilty. In *Lee* v. *State,* 8 *Ga. App.* 413 (69 S. E. 310), it was said: "While the general rule is that proof of other crimes committed by the defendant is not admissible in a criminal prosecution, still the general rule has many general exceptions. . . Though the defendant may have

been tried for violating the law as to one or more of these transactions with other patients, and acquitted, the State may nevertheless prove the facts connected with them, for the purpose of illustrating the defendant's state of mind as to the transaction at bar." In 1 Wharton's Criminal Evidence, 195, § 48, it is said: "The question has been raised in criminal trials whether a previous indictment for, or acquittal or conviction of, the other crime, has any effect upon the admissibility of the evidence of such other crime. It may be safely stated that the almost universal judgment is that neither of these circumstances will operate to the rejection of such evidence. . . It has been sometimes strenuously urged that while an indictment or a conviction might be admissible, yet where the fact is that the accused has been acquitted of the crime sought to be used as evidence, that fact should render it inadmissible, as to receive it would be to put the accused again in jeopardy and would also contravene the record. But the courts which have spoken upon the subject have all said, in substance, that he could not be put in jeopardy of a crime of which he had been acquitted, but that he was in jeopardy of the crime for which he was being tried; and that evidence of the transactions which had resulted in his acquittal was admissible if competent to show a fact material to the issue being tried." The author in a note cites quite a number of cases which is not necessary to set out here. And in Underhill's Criminal Evidence (3rd ed.), § 629, it is said: "The acquittal merely exempts him [the defendant] from punishment and from another prosecution. It does not necessarily show that he was innocent." The jury were properly instructed in this case that the defendant could be convicted only of the offense specified and set forth in the indictment upon which he was then on trial, and this caution to the jury was repeated.

■ In grounds 14, 15, 16, and 17 is set forth testimony of named witnesses which was admitted over the objection that it was irrelevant, inadmissible, and highly prejudicial to the defendant, and that it showed distinct and different alleged offenses. This evidence was not inadmissible for the reasons urged.

■ In one ground of the motion the contention is raised that the conviction of the defendant in this case was barred by the statute of limitations, because it is insisted the offense was committed some four years before the indictment. The contention that the prosecu-

tion is barred is not well taken. It is alleged in the indictment that the acts of the accused and the offense were unknown until after the date of January 1, 1930, that is, within two years before the special presentment was returned by the grand jury. The solicitor-general testified in the case that he did not know of the offense prior to that date. This was sufficient to make a prima facie case. In *Cohen* v. *State, 2 Ga. App.* 689 (59 S. E. 4), it was held: "The particular facts which constitute exceptions to the bar of the statute of limitations need not be minutely alleged in the bill of indictment. It is sufficient if any of the exceptions stated in the Penal Code, § 30, be stated in the language therein employed. As to such exceptions the State is only required to show a prima facie case, as this is not matter essential to the actual guilt or innocence of the accused. . . Where an offense is alleged to have been unknown, the State need only show that it was unknown to the prosecutor, in order to make prima facie proof of that allegation. Being a matter of defense, the defendant may rebut such proof by proving that the transaction alleged in the indictment as a violation of the law was known, and the general notoriety may be sufficient proof to establish the fact that it was not unknown." In the opinion in that case it was said: "And in those cases where the offense is against society in general and there is no prosecutor, the return by the grand jury of a presentment containing the exception will presumptively establish that the offense or offender was unknown, until the statement is denied by evidence on the part of the defendant. There is in this ruling no conflict with the established rule that the State must prove every material fact essential to show the guilt of him who is accused of crime; for, as we have stated, this is no part of the crime, but merely an exception to a rule in his favor." In *Mangham* v. *State, 11 Ga. App.* 427, 438 (3) (75 S. E. 512), it was said: "Besides, this was a special presentment by the grand jury, and the allegation that the offense charged was unknown was sufficient to cast upon the defendant the burden of showing that it was not true." We are therefore of the opinion that this case, under the allegations in the indictment, falls within the exception to the rule declaring that "Nor shall the limitations run so long as the offender or offense is unknown."

The evidence was sufficient to support the verdict.

*Judgment affirmed. All the Justices concur.*