992 A.2d 423

Robert L. THOMAS

v.

STATE of Maryland.

No. 22, Sept. Term, 2009.

Court of Appeals of Maryland.

April 9, 2010.

Brian L. Zavin, Asst. Public Defender (Nancy S. Forster, Public Defender, Baltimore), on brief, for petitioner.

Thomas M. McDonough, Deputy State Prosecutor (Robert A. Rohrbaugh, State Prosecutor, Towson), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

ADKINS, Judge.

Petitioner Robert L. Thomas was charged with bribery, conspiracy to commit bribery, and conspiracy to commit theft by deception for his role in an alleged bid-rigging scheme relating to the award of a local government security contract. Thomas was tried in the Circuit Court for Prince George's County (the "County"), and convicted on both bribery counts. On appeal, Thomas presents two questions for consideration:

1. Did the trial court err in instructing the jury that it is not a defense to the crime of bribery that the public employee did not have the actual authority, power, or ability to perform the act for which payment was demanded or received?

2. Did the trial court err by allowing a witness for the State to testify to his opinion regarding [Thomas's] role in the alleged bribery scheme?

Because Thomas's solicitation of a bribe was for an act reasonably related to his official capacity, and because the challenged testimony was relevant to the charge of conspiracy to commit theft by deception, we affirm Thomas's convictions.

## FACTS AND LEGAL PROCEEDINGS

During the events giving rise to this case, Thomas was the Deputy Director of the Prince George's County Office of Central Services ("OCS"). In this capacity, he was responsible for managing the County's vehicle fleet and facilities. He was not responsible for procurement of goods and services, which were the responsibilities of another Deputy Director, Floyd Holt.

In June 2003, the County invited contractor bids for the installation of a security management system in two County buildings. The invitation to bid included a notice that the County would consider expanding the contract to cover some one hundred forty additional buildings if funding so permitted. Forney Enterprises provided the lowest bid, on June 2, 2003. The next day, however, a new Director, Pamela Piper, was appointed to head OCS, and she retracted the invitation for bids shortly thereafter. In February 2004, OCS issued a request for proposals to fulfill the security contract, and appointed a five-person proposal analysis group to review submitted proposals and recommend a selection. Any recommendation made by the group still required Piper's approval in order to take effect.

On July 15, 2004, the group unanimously recommended that Forney Enterprises again be awarded the contract. The recommendation was rejected, however, after Thomas alerted Piper to a possible business relationship between Forney Enterprises and one of the group members, Corporal Keith Washington. Piper then directed interested vendors to give oral presentations on their proposals, and restructured the group, replacing two of its members with Thomas and Holt. On September 29, ADT/Tyco, the company that would ultimately receive the group's recommendation, gave its presentation. That presentation was attended by Melvin Pulley and

Dallas Evans, respectively the Director of Telecommunications and President of Interior Systems, Inc. ("ISI"), which would act as a subcontractor on the project. Thomas did not attend that presentation.

Following what they believed to be a successful presentation, Pulley, Evans, and others went to celebrate at a restaurant. According to Pulley, he there encountered Robert Isom, a "social friend" of his who was at the time working for the County. Isom offered to introduce Pulley to Thomas, whom he suggested "could help [ISI] win the contract." Pulley followed Isom to another restaurant, where they met Thomas. According to Pulley, Thomas told Pulley that he "knew all about ISI and the contract" and that "everyone on their committee worked for [Thomas]...." Pulley and Thomas discussed ISI; the next day, Isom contacted Pulley, saying that Thomas "wants to know if ISI and ADT will play." [1] Pulley replied in the affirmative, "as long as ISI knows what the game is."

On October 1, Isom called Pulley to arrange a lunch meeting between Thomas and Pulley. Thomas and Isom went to the same restaurant that had been the site of ISI's initial celebration, and waited for Pulley. Before Pulley arrived, Thomas told Isom that they would ask ISI for $250,000. When Pulley arrived, he met briefly with Thomas, who then directed him to Isom's table. Isom gave Pulley a piece of paper stating that Thomas could guarantee ISI the contract for $250,000, with half to be paid up front and half to be paid when the contract was awarded. The note also said that Thomas would then issue "change orders" so that ISI could recoup its expenses and be able to work on the additional one hundred forty buildings that might eventually be covered by

---

1. Isom eventually pled guilty to a charge of conspiracy to commit bribery, and testified at Thomas's trial in exchange for a reduced sentence. His description of these events differs in that he claims that he spoke to Evans, and not Pulley, at the first restaurant, and that it was Evans who suggested a meeting with Thomas. Nonetheless, Isom confirmed in his testimony that he called Pulley the next day, at Thomas's request, to "see if ISI would play."

the contract. After leaving the restaurant, Pulley reported the events of the meeting to Evans. On October 4, Pulley and Evans spoke to ISI's Chief Operating Officer, William Marcellino, as well as to ISI's counsel and vice-president. The group collectively decided to notify the authorities.

On October 6, Special Agent John Poliks of the Office of the State Prosecutor was assigned to investigate the case. The next day, Poliks met with Pulley, who allowed Poliks to copy a voicemail that had been left on Pulley's phone by Isom. The message contained directions from Isom for Pulley to contact him to set up a meeting with Thomas. In Poliks's presence, Pulley called Isom, to say that he had spoken with Evans, who felt that the "amount's a little steep." Isom replied that it was "no problem" and that "we just need to . . . get them together." On October 14, Pulley allowed Poliks access to five new voicemails from Isom, which included a phone number for "the other Bob[,]" presumably meaning Thomas.

That same day, Evans called Thomas in Poliks's presence, saying that he was "trying to understand exactly what the deal is." Thomas replied that he "[didn't] want to talk about it on the phone. . . ." Evans asked Thomas to clarify "what consideration [ISI would] be getting[,]" to which Thomas replied in part that "there's 144 buildings . . . [to] add security to," and that he was "going to make the decision" and then going to send a letter of intent to award. Later in the day, Evans called Isom, who told Evans that "what we're talking about" could be completed in twelve months. Isom added that "we understand that [the payment amount was] kind of steep . . . but [Thomas] just wanted to get assurance from you." Isom further added that Thomas wanted "to assure [Evans] that he's going to take you on your word[,]" and that ISI should "go ahead on and sign and you'll know the job's out there for contractor [sic]." Finally, Isom stated that he needed Evans's commitment because Thomas had to "make a decision today. . . ."

Under Poliks's direction, Isom and Pulley met at a Washington D.C. restaurant on October 19. The meeting was

surveilled by Poliks and Special Agent Rick Barger. At the meeting, Isom gave Pulley an envelope containing a draft "consulting agreement," and told Pulley that once the agreement was signed, Thomas would award the security contract to ADT/Tyco. The agreement called for ISI to retain Washington Business Management Consulting Group, LLC ("WCG") for a total fee of $260,000, payable in monthly installments. WCG was a consulting company belonging to Paul Wright, who had prepared the consulting agreement. Wright testified at Thomas's trial that Thomas had contacted him in October 2004 with an eye towards jointly pursuing consulting opportunities, but that he had never heard of ISI prior to these events, and that he never thought the consulting agreement was illegal.[2]

Pulley returned a "marked-up" copy of the consulting agreement to Thomas at the restaurant where the two had initially met. Thomas took the envelope without opening it, and told Pulley that "he was going to award the contract the next day to ADT and ISI." The contract was not in fact awarded the next day, though Thomas returned the signed agreement to Wright shortly after receiving it. When the contract was not awarded, Poliks directed Pulley to arrange a meeting, through Isom, between Thomas, Pulley, and William Marcellino. The meeting was set for November 1. Prior to the meeting, the Federal Bureau of Investigation supplied Marcellino with a check for $10,000, doctored to look like an ISI check. Thomas called Wright before the meeting, however, to say that he would not attend. Instead, Marcellino met with Isom and Wright (who had by then signed the consulting agreement himself). At the meeting, Marcellino gave Wright the check as an initial payment on the consulting agreement. Isom told

---

2. Wright was charged with bribery, conspiracy to commit bribery, and conspiracy to commit theft in connection with these events. He was acquitted on all counts prior to Thomas's trial. His testimony against Thomas came as part of an agreement to cooperate in an ongoing public corruption investigation in exchange for transactional, use, and derivative use immunity.

Pulley and Marcellino that Thomas was "going to release the contract that day" and follow with change orders thereafter.

Despite Isom's assurances, the contract was not awarded to ADT/Tyco that day. During this period, the proposal analysis group did unanimously recommend that the security contract be awarded to ADT/Tyco, with ISI as a subcontractor on the project. The group notified Piper of its recommendation during November 2004. Poliks again asked Marcellino to arrange a meeting with Thomas, which Thomas again did not attend. That meeting, on December 6, was attended by Wright at Thomas's request. Wright gave Marcellino a copy of a recommendation memorandum from Piper to Corporal Washington, indicating that Piper had accepted the group's recommendation to award the contract to ADT/Tyco. In January 2005, Poliks made an unsuccessful attempt to meet with Wright while posing as a project manager for ISI. Wright testified that around this time he ended his business relationship with Thomas for a number of reasons. Also in January, Isom told Pulley that he was "no longer part of this mess [Thomas] was doing [sic]."

On May 24, 2005, Poliks and Barger executed search warrants for the homes and offices of Thomas, Isom, and Wright. Numerous documents relating to WCG and the consulting agreement were seized from Wright's house. Thomas, for his part, stated during the search that he had no capacity to affect bidding on contracts in the County. He also denied that he had taken the "marked-up" consulting agreement from Pulley, though he admitted to doing paid accounting work for WCG. The seized documents showed that Wright had opened a business account on WCG's name on November 3, 2004, and had deposited the $10,000 check into that account. Both Thomas and Wright made withdrawals from that account, and Wright testified that he gave some or all of his withdrawals to Thomas.

Thomas was tried in the Circuit Court for Prince George's County, in August 2006, on charges of bribery, conspiracy to commit bribery, and conspiracy to commit theft by deception.

During trial, and over defense objections, Evans testified that at the time of his October 14 phone call to Thomas, he believed that Thomas had the authority to influence the awarding of contracts for the County.[3] Prior to deliberations, the jury received instructions on bribery, including the following statement:

It is not a defense to the crime of bribery that the public employee did not have the actual authority, power or ability to perform the act for which the money was demanded or received.

Thomas was convicted on charges of bribery and conspiracy to commit bribery, and acquitted on charges of conspiracy to commit theft by deception. On May 11, 2007, Thomas was sentenced to twelve years in prison with all but thirty months suspended in favor of five years of supervised probation. He was also ordered to pay $10,000 restitution.

Thomas appealed the verdict on the grounds that the trial court erred in instructing the jury that Thomas's lack of actual authority to award the contract was not a defense to bribery, and that the trial court erred in allowing Evans to testify as to his belief in Thomas's actual authority to award the contract. *Thomas v. State*, 183 Md.App. 152, 166, 173, 960 A.2d 666, 674, 678 (2008). The Court of Special Appeals affirmed the judgment of the trial court on both grounds, holding that the trial court's jury instructions "fairly conveyed Maryland law on bribery." *Id.* at 171, 960 A.2d at 677. The intermediate appellate court further held that even if Evans's testimony was improper, Thomas suffered no harm or prejudice as a result of the testimony. *Id.* at 173–74, 960 A.2d at 678. We granted Thomas's petition for a writ of certiorari to consider

---

**3.** Specifically, Thomas objected to the following exchange:

[THE STATE:] And what did you believe, again, this date and this time; what did you believe was [Thomas's] ability to influence the awarding of the contract that you were involved in bidding on?

\* \* \*

[EVANS:] As [Thomas was] Deputy Director of Contracts and Procurement, I believed that the position can have influence over or does influence or would influence the awarding of a contract.

both issues. *Thomas v. State,* 407 Md. 529, 967 A.2d 182 (2009) (granting certiorari).

## DISCUSSION

Thomas presents two issues for our consideration upon appeal.[4] We will discuss each argument in turn.

### The Jury Instruction On Bribery

■ Thomas argues that the trial court erred in instructing the jury on bribery because the court stated that a defendant's lack of actual authority to perform an act was not a defense to receiving or soliciting a bribe to commit that act. We disagree.

■ An appellate court, reviewing jury instructions, will leave the judgment undisturbed so long as the instructions fairly cover the law. *Smith v. State,* 403 Md. 659, 663, 944 A.2d 505, 507 (2008). We will reverse a judgment and remand for a new trial, however, where the instructions are "ambiguous, misleading, or confusing" to jurors. *See Battle v. State,* 287 Md. 675, 684–85, 414 A.2d 1266, 1271 (1980).

In this case, our determination as to whether the instruction on bribery "fairly covered the law" requires interpretation of Section 9–201(c) of the Criminal Law Article ("C.L."), which reads as follows:

A public employee may not demand or receive a bribe, fee, reward, or testimonial to:

(1) influence the performance of the official duties of the public employee; or

---

4. The questions presented for review are:
 1. Did the trial court err in instructing the jury that it is not a defense to the crime of bribery that the public employee did not have the actual authority, power, or ability to perform the act for which payment was demanded or received?
 2. Did the trial court err by allowing a witness for the State to testify to his opinion regarding [Thomas's] role in the alleged bribery scheme?

(2) neglect or fail to perform the official duties of the public employee.

*See* Md.Code (2002, 2008 Supp.) § 9–201(c) of the Criminal Law Article.[5] The statute does not discuss the connection between an employee's actual authority and the act for which the employee was bribed. Instead, the statute refers only to the employee's "official duties." In this case, therefore, we must determine if the act for which Thomas solicited a bribe, though outside of his actual authority, was sufficiently related to the performance of his official duties so as to be encompassed by the statute.

■ Although this question is one of first impression for this Court, the Court of Special Appeals has twice before the present case held that a public employee need not have actual authority to act in a particular capacity in order to be guilty of soliciting a bribe in relation to that act. *See Richardson v. State,* 63 Md.App. 324, 331–33, 492 A.2d 932, 936–37 (1985); *Kable v. State,* 17 Md.App. 16, 22, 299 A.2d 493, 497 (1973). In *Kable,* for example, that court held that it was bribery for "a public official [to accept money] to act corruptly in a matter to which he bears some official relation. . . ." *Id.* (quotation marks and citation omitted).

■ Likewise, several of our sister states, without explicit legislative commands on this issue, have consistently held that a public employee acting within her official capacity need not have authority to complete a specific act in order to be convicted of soliciting a bribe in connection with that act.[6]

---

**5.** Unless otherwise provided, all statutory references are to the Criminal Law Article (2002, 2008 Supp.).

**6.** *See, e.g., State v. Hendricks,* 66 Ariz. 235, 186 P.2d 943 (1947); *State v. Carr,* 172 Conn. 458, 374 A.2d 1107 (1977); *Raines v. State,* 65 So.2d 558 (Fla.1953); *Taylor v. State,* 174 Ga. 52, 162 S.E. 504 (1931), *overruled on other grounds, Moore v. State,* 254 Ga. 674, 333 S.E.2d 605 (1985); *State v. Potts,* 78 Iowa 656, 43 N.W. 534 (1889); *State v. Campbell,* 73 Kan. 688, 85 P. 784 (1906); *Commonwealth v. Avery,* 301 Mass. 605, 18 N.E.2d 353 (1938); *State v. Ellis,* 33 N.J.L. 102 (N.J. 1868); *People v. Chapman,* 13 N.Y.2d 97, 242 N.Y.S.2d 200, 192 N.E.2d 160 (1963); *Wells v. State,* 174 Tenn. 552, 129 S.W.2d 203 (1939); *see*

The Supreme Court of Arizona clearly stated the rationale for interpreting bribery statutes to encompass those activities within a broad definition of an employee's official duties:

> The reason for making it an offense to bribe a public officer is because of its tendency to pervert justice. . . . An officer's conduct need not be specifically prescribed by statute in order to constitute official action, and it is sufficient that the duty exists by reason of natural implication from the powers specifically granted by statute, or by reason of the lawful custom or regulation of a department of government. . . . Once the gist of the crime is apparent, a strict and technical interpretation of an officer's duty becomes as senseless to logic as it is legally deplored by the weight of authority.

*State v. Hendricks,* 66 Ariz. 235, 186 P.2d 943, 947–48 (1947) (citations and quotation marks omitted). We view this line of authority as implicitly introducing an element of reasonableness into the determination of what are the bribed person's "official duties." In our view, the reasonableness element involves both consideration of what an objective, outside observer would understand her duties to be, and what the public employee would expect the penal statute to proscribe, or common sense for that matter.

Our sister states have permitted a lack of actual authority to stand as a defense only when the act that is the object of bribery is completely and utterly unrelated to a public employee's official duties. Those courts have correctly held that, under such circumstances, while it "might be morally improper and may well involve some other crime to give or offer money to [induce] an officer to do an act totally unrelated to his job, it would not be bribery." *Hendricks,* 186 P.2d at 948. Thus, if a public employee accepts a payment for an act that could not reasonably be construed as related to her official duties, it cannot be considered a bribe.

*also United States v. Anderson,* 32 M.J. 949, 950 (N–M.Ct.Mil.App.1991) (holding that "apparent authority to do the object of the bribery" is sufficient to sustain a conviction under the Uniform Code of Military Justice).

Thomas, in his brief, argues that we should apply this rationale in holding that his solicitation here was entirely outside of his official duties. We disagree. Thomas was a member of the proposal analysis group charged with evaluating bids for the security contract. Even if he lacked the actual authority to award the contract himself, he was intimately involved in the award process as a function of his official position, and it is therefore reasonable to view his solicitation as related to his official duties. Accepting Thomas's position on this issue would mean that only the most powerful public officials, those vested with the unilateral or ultimate power to act, could be convicted under the bribery statute. This is not consonant with the text or purpose of the statute.

Thomas's case bears a particular resemblance to *Raines v. State,* 65 So.2d 558 (Fla.1953). In *Raines,* the Supreme Court of Florida held that a member of a state licensing board for barbers could be convicted of soliciting a bribe to issue a barber's license, in spite of the fact that he himself could never issue such a license without the acquiescence of other members of the licensing board.[7] *Id.* at 560. The court noted that it was "well settled that an officer cannot be charged and convicted of an act that is entirely outside the scope of his legal duties." *Id.* Nonetheless, the court upheld the bribery

---

7. The Florida statute on bribery, *see* Florida Statutes § 838.02 (1953), at the time was as follows:

 **838.02 Officer accepting bribe.**—Every officer, state, county or municipal, or any public appointee, or any deputy of any such officer or appointee, who corruptly accepts, requests or solicits a gift or gratuity, or a promise to make a gift, or do an act beneficial to such officer, public appointee or deputy, under an agreement or with an understanding that his vote, opinion or judgment shall be given in any particular manner or upon a particular aside of any question, cause or proceeding which is or may be by law brought before him, in his official capacity, or that in such capacity he shall make any particular nomination or appointment, shall forfeit his office or appointment, be forever disqualified to hold any public office, trust or appointment under the constitution or laws of this state, and be punished by imprisonment in the state prison not exceeding ten years, or in the county jail not exceeding one year, or by fine not exceeding five thousand dollars.

conviction, applying the rationale that the defendant's acts could fairly be termed "receiv[ing] anything of value to influence the receiver's official action. . . ." *Id.* Similarly, Thomas himself was incapable of awarding the security contract, despite his blunt assertion to ISI that he possessed the power to ensure the award in exchange for illicit compensation. But with Thomas's position in the proposal analysis group, he could influence the award to be made by the Director of OCS. The combination of Thomas's official position and his statements to ISI make it reasonable to view this solicitation as related to his official duties. As such, his actions are included within our bribery statute.

We hold that a public employee cannot claim as a defense to bribery the lack of actual authority to commit an act where the act is reasonably related to the employee's official duties. The trial court's jury instruction was thus a proper statement of Maryland law on bribery, and does not require a reversal of that court's judgment.

## Propriety of Evans's Testimony

Thomas additionally argues that it was error for the trial court to permit Evans to testify that he believed Thomas was actually capable of awarding the security contract. Thomas contends that Evans's subjective beliefs are irrelevant to all three of the charges allayed against Thomas.

### *Preservation*

Before reaching the substance of this issue, we must first dispense with the State's argument that "[t]here is nothing in the record which suggests this basis for the petitioner's objection at the trial." The record shows that the following exchange occurred during Evans's testimony:

THE STATE: And what did you believe, again, this date and this time; what did you believe was [Thomas's] ability to influence the awarding of the contract that you were involved in bidding on?

THOMAS'S COUNSEL: Objection, Your Honor.

THE COURT: Let's approach the bench.

[At the bench:]

THE COURT: Do you have much more to go on this witness [Evans]?

THE STATE: I have about maybe two minutes.

THE COURT: His beliefs, his understandings, his perceptions are not at issue. The issue is, did this man enter into a conspiracy and accept a bribe.

THE STATE: If I may, Your Honor, I respectfully disagree insofar as it's been no secret from the beginning of the case that [it is the] defense's position that [Thomas] didn't have actual ability to influence, actual ability to do certain things. And I think it's crucial that the jury hear what these people believed [Thomas] could do the whole way. If they believed he had the ability to influence the contract, that would be why he's entering-why he's going into the contract.

This is also, as [co—counsel] just pointed out to me, we're talking about conspiracy to commit theft by deception. This is evidence of his intent to deceive, as well.

THE COURT: Anything else?

THE STATE: No, Your Honor.

THE COURT: You can ask the questions, but let's get it to a close.

What we deduce from the colloquy above is that the trial court's initial reaction to the testimony offered by the State was that the testimony was not relevant because Evans's understanding or beliefs were not relevant to the question of whether Thomas accepted a bribe. The State countered with two theories of relevancy, and the trial judge then stated that he would allow the testimony, apparently accepting one or both of those theories. This Court ordinarily will not consider any issue on review unless it has been raised in or decided by the trial court. *See* Md. Rule 8–131(a). Grounds for objection, however, need not be stated unless so directed by the trial court or on a party's own initiative. *See* Md. Rule 4–323(a)–(c). In this case, Thomas's objection was a general one, and thus preserved all available grounds, including the arguments he now presents.

*Merits*

 Thomas argues that Evans's testimony should not have been admitted because it was not relevant to the charges against him. He also contends that the testimony was lay opinion that does not qualify under Maryland Rule 5–701, which governs opinion testimony by lay witnesses.[8]

To determine whether there was error in the admission of Evans's testimony, we consider the purposes for which it was admitted. Although the trial court did not indicate any basis for its decision to admit Evans's testimony, it decided to do so after the State offered two theories of relevancy, which are stated above. We begin and end with the State's second theory-that Evans's testimony was relevant to the charge of conspiracy to commit theft by deception.

Section 7–104 of the Criminal Law Article makes it a crime to "obtain control over property by willfully or knowingly using deception. . . ." C.L. § 7–104(b). Section 7–101 of the Criminal Law Article defines "deception," in part, as knowingly "fail[ing] to correct a false impression that the offender previously has created or confirmed. . . ." C.L. § 7–101(b)(ii). Applying these definitions, we consider it clear that Evans's testimony was relevant to the charge of conspiracy to commit theft by deception. As the State indicates in its brief, Thomas told Evans that he was "going to make the decision" during the phone call that was the subject of Evans's testimony. It is indisputable that Thomas made this statement, as the phone call was recorded by Poliks—at trial, the recording was played in open court, and a transcript of the call was admitted as an exhibit. The fact-finder could conclude that Thomas endeavored to create a false impression in Evans's mind that Thomas had the capacity to award the contract.

---

**8.** Rule 5–701 provides:

> If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

Indeed, Thomas's fraudulent intent is suggested by his defense that he had no authority to award the contract, when there was evidence that Thomas told Evans the exact opposite, i.e., that he was going to make the contract award decision almost immediately. In this context Evans's testimony was admissible not to prove that Thomas actually had the authority to award the contract, but that Thomas said that he did, intending to deceive Evans. Evans's belief in Thomas's abilities to influence the contract is relevant in that it helps to demonstrate the shrewdness of Thomas's deception.

Thomas also argues that Evans's testimony was lay opinion evidence in violation of Maryland Rule 5–701. We do not agree. Evans's testimony that he believed Thomas had that authority is not a lay opinion, because it was admitted not to show that Thomas actually had any authority. Rather, the testimony simply demonstrated the skillfulness that Thomas brought to bear on his deception of Evans.[9]

Because Evans's belief in Thomas's authority to deliver the security contract was relevant to the charge of conspiracy to commit theft by deception, the trial court did not err in permitting Evans to testify on that matter. Thomas could have sought an instruction limiting the use of Evans's testimony to the bribery charges alone. *See* Md. Rule 5–105. There is no indication that he did so. Thus, we need not decide if Evans's testimony was also admissible with respect to the bribery charges.

## CONCLUSION

We hold that the trial court's jury instruction on bribery was sufficient because it fairly described Maryland law on

---

9. Even if we were to treat Evans's testimony as lay opinion, it likely would meet the criteria of Rule 5–701. His testimony that he believed Evans had the authority to award the contract is the direct product of Evans's personal perceptions (his phone conversation with Thomas), and is relevant to understanding part of his testimony (the false impression that Thomas created). Evans's testimony thus meets both requirements of Rule 5–701.

bribery—namely, that it was not a defense to bribery that Thomas lacked the actual authority to perform an act. Because the act to be performed was reasonably related to Thomas's official duties, the bribery convictions will stand. We also hold that the admission of Evans's testimony was not in error, because Evans's beliefs with respect to Thomas's actual authority were relevant to the charge of conspiracy to commit theft by deception. The judgment of the Court of Special Appeals is affirmed.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE PETITIONER.**