30 A.3d 197

**Raymond Carroll HANDY**

v.

**STATE of Maryland.**

**No. 3043, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Oct. 26, 2011.

524

Celia A. Davis (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for appellant.

Tennant D. Magee, Sr. (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: EYLER, JAMES R., WOODWARD and J. FREDERICK SHARER (Retired, Specially Assigned), JJ.

J. FREDERICK SHARER (Retired, Specially Assigned), J.

Appellant, Raymond Carroll Handy, was charged in the Circuit Court for Baltimore City with the first degree murder of Mark Christopher Jones, use of a handgun in the commission of a felony and crime of violence, and wearing, carrying, and transporting a handgun. Appellant's first jury trial ended in a mistrial on March 27, 2006.

At the conclusion of appellant's second trial on December 13, 2007, the jury found him guilty of all three crimes. Appellant was sentenced to life imprisonment for the first degree murder, consecutive to a sentence already being served, followed by a consecutive sentence of 20 years for use of a handgun, the first five years without possibility of parole. The remaining handgun conviction was merged.

In his timely appeal, appellant asserts, as slightly rephrased, that:

1. The trial court erred in admitting into evidence portions of his statement made to police.

2. The trial court erred by failing to disclose notes received from the jury and by failing to comply with Maryland Rule 4–326 governing communications with the jury.

3. The evidence is legally insufficient to sustain the convictions.

Finding neither error nor abuse of discretion, we shall affirm.

## FACTUAL BACKGROUND

Mark Jones suffered fatal wounds in a shooting that occurred in the 2900 block of Greenmount Avenue in Baltimore City on May 1, 2005. He sustained three gunshot wounds to his back, one to the back of his left thigh, and one to his right forearm. The medical examiner who performed the autopsy opined at trial that Jones died as a result of multiple gunshot wounds, and that the manner of death was homicide.

Duvalle Johnson, a firefighter/paramedic with the Baltimore City Fire Department, testified that on May 1, 2005, she was training with another firefighter paramedic, David Couvillion. During that afternoon, Johnson and Couvillion were traveling northbound on Greenmount Avenue in a medic unit, driving from a nearby hospital to the fire station located at Greenmount Avenue and 32nd Street. They observed the victim, Mark Jones, and appellant walking on the southbound side of Greenmount Avenue. After stopping briefly at the fire station, Johnson and Couvillion continued driving several blocks south on Greenmount Avenue. Appellant and Jones, apparently carrying a bag of groceries, were still walking southbound.

Johnson testified that, as she stopped the medic unit at a traffic light, she saw appellant remove a handgun from his waistband and point the gun at Jones. Jones turned to see appellant, and then tried to run away. At that point, appellant fired four or five shots in quick succession. Johnson, who was only 15 feet away from the shooting, clarified that she saw the first gunshot and heard the remaining shots. After the shooting, appellant, described as being five feet nine or ten inches tall, with a medium to light-brown complexion and with cornrows in his hair, ran north on Greenmount Avenue.

As Couvillion described the events to their dispatcher, Johnson stopped the medic unit and began to treat Jones, who was unable to speak at the time. Johnson cut Jones's shirt off and noticed two holes in his chest. Jones was transported to Johns Hopkins Hospital. At appellant's second trial, Johnson identified appellant in court as the person who shot Jones. However, on cross-examination by appellant's counsel, Johnson agreed that she was shown a photo array on December 30, 2005, by Detective Robert Dohony, and was unable to make an identification of the shooter at that time.

At the conclusion of the State's case-in-chief, Johnson was re-called as a defense witness. A videotaped portion of her testimony from the prior trial was played for the jury. The tape revealed that when Johnson was asked at the first trial whether she recognized the individual she saw shoot the victim, she replied, "I cannot say with 100 percent certainty that I do right now." Johnson did not recall whether she identified appellant at the prior trial.

Also during the defense case, Johnson was asked on cross-examination, whether she remembered saying that she recognized appellant as the shooter. Johnson replied that "I said it at a point, but it wasn't in the courtroom when I did it. The initial time, that was the first time that I actually saw him in person." Johnson testified that she "didn't exactly feel comfortable at that point when I looked at him, because I only seen him in passin', and then when I looked at him in court, I didn't honestly feel exactly comfortable and a hundred percent sure sayin' it right then and there when I said it."

When asked whether she was certain of her identification of appellant during the second trial, Johnson replied: "I felt a hundred percent certain sittin' right there in that chair lookin' at the Defendant in his eyes that I saw that shoot. [sic]" On redirect, Johnson denied that her identification of appellant was based on the fact that she saw him at the prior trial because, according to Johnson, "I have nothin' to gain by doin' it."

David Couvillion, of the Baltimore City Fire Department, testified in the State's casein-chief that he was a firefighter/paramedic on May 1, 2005, and that he was the passenger in the medic unit being driven by Johnson. While they were driving, Couvillion heard gunshots and saw appellant shooting the victim, Mark Jones. Couvillion testified that he heard five shots and that he actually saw a black handgun being fired. He also saw appellant run past the medic unit, proceeding north on Greenmount Avenue until he turned left onto 30th Street. Couvillion further testified that appellant's hairstyle at trial was different because his hair was styled in cornrows on the day of the shooting.

Couvillion began treating Jones, who was "obviously in, in a lot of trouble. He had obvious gunshot wounds to his chest and after that he pretty much stopped breathing." Couvillion and other paramedics attempted to advance an airway into Jones's throat and administered various drugs via an IV to attempt to restart his heart. Couvillion also went with Jones to Johns Hopkins Hospital, where he stayed for approximately two hours.

Later that day, Couvillion spoke with police and was asked to look at a photo array. Couvillion identified appellant's photograph and then wrote on the back, "[a]s best as my recollection serves, serves me, the individual that I have selected on the back of this form is the man that closely resembles the man that I witnessed shooting another man." When asked to explain why he indicated the photograph "resembles" the shooter, Couvillion explained that "the shooting occurred in a very dynamic and fluid setting and, and this picture is, is a 2–D representation of a man looking directly in my eyes, which is, you know, not exactly the way that it transpired on the street." Couvillion testified that he did not have any doubt that the person he identified was the person who shot Jones.[1]

---

1. Couvillion was then asked by the court about the basis for picking appellant's picture and what effect the cornrows had on his selection. As these questions were based on questions proposed by the jury, and

Couvillion gave further detail about the location of the shooting and how long he observed appellant and Jones. Couvillion testified that he observed appellant for "a total of 10 seconds, ya know, from the beginning of the shooting to when he passed the medic unit to when he went around the corner." Couvillion was asked how he could be so certain, and he replied that having a person shot in front of you "kinda stays with you" and that "it's very, it's extremely vivid." Couvillion further testified:

> When I heard the first two shots, I wasn't looking directly at them, but those first two shots brought my attention directly back to those two individuals who at that time were, it appeared to be they were walking towards me and the, Mr. Handy had come around from his left side and was shooting at, it looked like from my perspective in the chest and running back this way towards 30th Street and maybe three or four more shots after that.[2]

Theresa Manley testified that she was in the area near the shooting on May 1, 2005, and she saw appellant shoot Jones. Although Manley did not see a gun, she heard the gunshots. Manley testified that while she did not know appellant, she had seen him in the neighborhood on prior occasions. On July 6, 2005, Manley identified appellant in a photo array and wrote on the back of that array that "[t]his is the guy that I saw shoot Floyd on Greenmount Avenue." Manley explained that she knew both Mark and Floyd Jones and that the brothers looked similar.

On cross-examination, Manley admitted that she gave a statement to police, in which she said she saw the shooter get out of a car, walk over, then shoot the victim. She told police

---

as they are the subject of appellant's second issue presented, we will provide more detail in the following discussion.

**2.** After he testified concerning photographs of appellant with different hairstyles, Couvillion's direct examination concluded with the court asking another juror question about whether and when Couvillion saw appellant's face. Again, further detail will be provided in the following discussion of appellant's second issue presented.

that the shooter got back into a car and left the scene. She also stated that she heard the victim say, "I've been shot." After being asked to clarify her testimony, Manley, who earlier admitted to having problems with drugs, replied, "[y]ou know, on that day, I mean, I really don't really remember." However, Manley testified that she saw appellant's face as he ran across the street after the shooting.

Kanakia Feagins testified that, after she was arrested in 2005 on a charge of drug distribution, she gave a statement to police concerning the shooting of Jones on May 1, 2005, on Greenmount Avenue. Feagins testified that she was on Bethel Avenue on or about May 13, 2005, when she encountered appellant. At that time, appellant had a handgun in his hand and "was mad" and yelling. When asked what appellant said, Feagins replied that appellant said "[h]e was going to teach people about messin' with his family and that's all I know." She testified that appellant also told her that he shot someone three times in the back in broad daylight, and that he was going to "kill the rest of 'em." Feagins identified a photograph of appellant in a photo array.

Feagins testified on cross-examination that she was told that the person she saw on the street was named Michael Poole. Feagins was given this information by a fellow drug user named Howard, who claimed that Michael Poole was his nephew. She also admitted that she was using drugs and was "high" at the time. On redirect examination, Feagins testified that she actually did not know the name of the person who was waving the gun, but she was positive that it was the same person she picked out in a photo array.

Floyd Jones, the victim's younger brother, testified that Mark Jones was living near 25th Street and Greenmount Avenue, in May 2005. After being informed that his brother had been shot, Floyd Jones went to his brother's house, where he spoke with Detective Robert Dohony. Floyd Jones told the police that his brother "had been in some trouble in the past with certain people and these certain people, now they're home and was threatenin' my brother's life." When asked to

explain, Floyd Jones testified that he knew that appellant had just returned from prison and that appellant lived near his brother's house. Floyd Jones knew appellant from the neighborhood and testified that appellant's nickname was "Yuck."

Floyd Jones further testified that a person named Michael Poole had been shot five years earlier, and there were rumors in the neighborhood that Mark Jones was somehow involved in that shooting. Floyd Jones did not have reason to believe that his brother had any problems with Michael Poole, and he also did not know of any relationship between appellant and Poole.

Michael Poole testified that he knew appellant and that his daughter was appellant's cousin. When asked if he knew that appellant, who called Poole "Unc," had identified Poole as the person who shot Mark Jones, Poole testified that he "never heard him say that directly, that I was the one, so I can't comment on that." When asked to assume that appellant identified him as the shooter, Poole replied that he did not know why appellant would say that.

Poole testified that he learned that Mark Jones had been shot by reading about it in the newspaper. Poole also testified that he did not ask his brother "Brad," to obtain a gun for him in 2005; that he never told appellant in a telephone conversation that he shot Mark Jones;[3] that he was shot in 1999, but that he did not recall being shot by Mark Jones; and that he had heard the nickname "Jabo," and believed that referred to a brother of Mark Jones.

Poole further testified that he was five feet, five inches tall and weighed approximately 230–240 pounds in 2005; was dark complected and always wore his hair short, and not in cornrows. Poole also admitted that he told police that he heard that appellant's nickname was "Yuck."

Detective Robert Dohony, of the Baltimore City Police Department's Homicide Unit, testified that he responded to the scene of the shooting on May 1, 2005, where he met with, and was briefed by, Officer Jean Nolet. Dohony also spoke to

---

3. "Brad's" last name does not appear to be included in the record.

the Jones family and, as a result, appellant became a possible suspect. Dohony also spoke to Manley and Feagins and showed each of them a photo array. Both Manley, a witness to the shooting, and Feagins, identified appellant as the shooter.

Dohony spoke to the firefighter/paramedics who witnessed the shooting, and he testified that Johnson initially was unable to make an identification from a photo array. Johnson informed the detective that she could identify appellant if she saw him again, and Detective Dohony believed that Johnson did, in fact, eventually identify appellant. The other firefighter paramedic, Couvillion, made an identification of appellant.

Dohony told the jury that he learned of a possible connection between appellant and Jones, based on the prior shooting of Michael Poole. Poole and appellant were related. After testifying that Feagins informed police that she saw appellant waving a gun, and saying that "he had shot someone who had done something to his family in the past," Dohony further explained that the investigation of the Poole shooting revealed that the shooting was related to money owed as a result of a dice game. Mark Jones was involved in that game.

In his investigation, Dohony spoke with Poole about that incident and whether he had any connection with the murder of Jones. Poole was not considered by the police as a suspect in the murder because he did not match the descriptions given of the shooter. Poole was shorter, balder, heavier, and darker-complected than the person the witnesses described as the shooter. The suspect in the Jones shooting was described as a black male in his late 20's, about 5'9" to 5'10", and with a cornrow hairstyle. A photograph of appellant, taken when he was arrested on July 19, 2005, was admitted into evidence.

Forensic evidence was also admitted at appellant's trial. Shell casings were recovered near the scene of the shooting, suggesting that the weapon used was a semiautomatic gun. A firearms expert opined that the shell casings were all fired from the same firearm.

We shall provide additional facts as necessary to our discussion.

## DISCUSSION

### 1. *Appellant's statement to police*

After being taken into custody, appellant waived his rights under *Miranda*[4] and made a statement to police. During Dohony's direct examination, the court permitted portions of that statement to be read to the jury. In this respect, appellant asserts that the court erred.

Prior to hearing testimony on the second day of trial, and after Michael Poole had testified on the first day, appellant's counsel objected to the State playing a recording of appellant's statement to police on the grounds that the statement was hearsay, testimonial, and had no probative value. Specifically, counsel argued:

[I]t's hearsay. It's definitely an out of court statement. It's being used to prove the fact that Mr. Handy said these things, Your Honor. And I don't believe it falls within any of the exceptions. It's not an exception against any penal interest because he didn't make [sic] anything that would be inculpatory in these statements, Your Honor.

Appellant's counsel further contended that there were no admissions in the statement and, in fact, there were several denials made by appellant. The State responded that the statement was admissible as a statement of a party opponent.

The court ruled as follows:

THE COURT: Well, I think you're both right, actually. The whole statement doesn't come in because—the section does say what [the prosecutor] says. But fundamental to, in my reading of the law, fundamental to a criminal's trial, not a criminal, a Defendant's constitutional right to remain silent limited to admissions unless there are compelling

---

4. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)

legitimate reasons for otherwise. And I think [the prosecutor] has laid a foundation by calling the witness for which the Defendant has said he did it.

[DEFENSE COUNSEL]: Mr. Poole.

THE COURT: Mr. Poole. I believe [the prosecutor] can use those direct portions with regard to—and I'll indicate that that can be used with regard to credibility of Poole. Even though it wasn't a prior statement made by him, I think [the prosecutor's] got the right to say that look, the Defendant said he did it. He testified in front of you. You have the right to decide based on what he said after being advised of his *Miranda* rights and under no compulsion with regard to that issue.

The court ruled that the entire statement would not be played, but there could be a stipulation that appellant gave the statement voluntarily and in compliance with *Miranda*. Finally, the court ruled "[t]he statement of the Defendant can be used with regard to determining the credibility of Poole who testified." The State agreed that, during Detective Dohony's testimony, reference would be limited to three specific portions of appellant's statement to police. In sum, these included: (1) appellant's statement that he was told by Brad that he needed a gun for protection because "Mike killed Mark[;]" (2) appellant's statement that "Unc" told him that "he handled his business[;]" and (3) the fact that appellant called Michael Poole "Unc."

Defense counsel again objected, maintaining that the statement was hearsay and violated appellant's Fifth Amendment rights. While the court agreed that an exculpatory statement is ordinarily not admissible, the limited portions of appellant's statement indicated by the State had "probative value with regard to the credibility of [Poole]." The court reiterated that the specific portions of appellant's statement "can be used with regard to determining credibility of witness Poole who testified and for no other reason."

Subsequently, on direct examination, Dohony testified that appellant was arrested on July 19, 2005, then transported to

police headquarters where he was advised of his *Miranda* rights. Appellant waived his rights and agreed to speak with police. Dohony also testified that appellant was not forced or threatened, and was not promised anything in exchange for speaking with police. Dohony also identified two forms used by the Baltimore City Police, including one that included appellant's name, address, and other relevant personal information, and another form, which was a log of the interview.

Thereafter, prior to the State asking Dohony specific questions about appellant's statement, defense counsel made a general objection for the record. The court instructed the jury as to the limitations of the statement:

> Members of the jury, the entire statement is not coming in. Portions of this statement are being read, question and answer, and can be used only by you with regard to your determination of the credibility of witness Poole who testified and for not other reason. Everybody understand that?

The following then ensued:

[PROSECUTOR]: Okay. At the bottom of page three, counsel.

Q. Your question, the last sentence.

A. "Okay. Tell me what you know about this incident."

Q. Okay. And what was Mr. Handy's response?

A. Mr. Handy's response was, "Well, I was told, I was told on Lanvale and Barclay when I was told by Brad, well, Brad came down there and asked me for a, do I know anybody that have a gun or can I get, you know, get my hands on a gun. I told, I told him, I told him why, what's wrong and he said because he think Jabo's going to come back and get him because Mike, umm, killed Mark and he wanted to protect himself. He not going to go running and hiding nowhere."

Q. Okay. Now, do you see where you ask him who Unc is?

A. Yes. I asked Mr. Handy, "And who do you call Unc?"

Q. What was his response?

A. Mr. Handy's response was, "Michael Poole."

Q. Okay. And then—I wanna make sure I'm asking you to read the right—oh, here ya go. Same page, at any time. A. "At any time did Unc ever tell you that he shot the victim?" Q. And what was Mr. Handy's response to that? A. Mr. Handy's response was, "I talked to him on the phone. He, he said he handled his business." [5]

On appeal, appellant presses his claims that this testimony by Dohony amounted to hearsay within hearsay and that the trial court erred in admitting the evidence. The State responds that, while appellant's trial counsel objected on the grounds of hearsay, the issue is unpreserved because counsel did not specifically contend that the evidence was hearsay within hearsay. The State also responds on the merits that the evidence was admissible as non-hearsay because it was not admitted for its truth and, therefore, that any error was harmless beyond a reasonable doubt.

Maryland Rule 8–131(a) provides, in pertinent part:

Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal.

Further, "[i]t is well-settled that when specific grounds are given at trial for an objection, the party objecting will be held to those grounds and ordinarily waives any grounds not specified that are later raised on appeal." *Klauenberg v. State*, 355 Md. 528, 541, 735 A.2d 1061 (1999); *accord Ayala v. State*, 174 Md.App. 647, 665, 923 A.2d 952, *cert. denied*, 401 Md. 173, 931 A.2d 1095 (2007); *see also Thomas v. State*, 183 Md.App. 152, 177, 960 A.2d 666 (2008) ("Where a party asserts specific grounds for an objection, all other grounds not speci-

---

5. Detective Dohony testified that this statement referred to the same Michael Poole that he interviewed and eliminated as a suspect. When Dohony informed Poole that appellant had identified him as the shooter, Poole became "upset."

fied by the party are waived."), *aff'd,* 413 Md. 247, 992 A.2d 423 (2010).

■ As we have noted, prior to hearing testimony on the second day of trial, defense counsel moved *in limine* to preclude the State from introducing appellant's statement. Contending that the entire statement was hearsay, defense counsel argued that the statement was being used to prove the truth of the matter asserted and that it did not fall under any exception to the rule against hearsay. Thereafter, during Dohony's testimony, and immediately before Dohony was asked about appellant's statement, defense counsel offered a general objection for the record. Based on our reading of the transcript, we conclude that defense counsel's motion *in limine* was sufficiently specific to alert the trial court to the underlying nature of the objection. Moreover, appellant's subsequent general objection, immediately before the testimony was admitted, was sufficient to preserve all grounds of objection. *See Johnson v. State,* 408 Md. 204, 223, 969 A.2d 262 (2009) ("A party basing an appeal on a 'general' objection to admission of certain evidence, may argue any ground against its inadmissibility.").

Therefore, we reject the State's preservation argument and shall consider the merits of appellant's argument.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5–801(c). Further, "[e]xcept as otherwise provided by these rules or permitted by applicable constitutional provisions or statutes, hearsay is not admissible." Md. Rule 5–802. The Court of Appeals has stated:

> Hearsay, under our rules, must be excluded as evidence at trial, unless it falls within an exception to the hearsay rule excluding such evidence or is 'permitted by applicable constitutional provisions or statutes.' Md. Rule 5–802. Thus, a circuit court has no discretion to admit hearsay in the absence of a provision providing for its admissibility.

Whether evidence is hearsay is an issue of law reviewed *de novo*.

*Bernadyn v. State*, 390 Md. 1, 8, 887 A.2d 602 (2005); *accord Parker v. State*, 408 Md. 428, 436, 970 A.2d 320 (2009).

█ Both parties recognize that an out-of-court statement of an adverse party is admissible as an exception to the rule against hearsay. *See* Md. Rule 5-803(a)(1). However, appellant argues that the portions of his statement, when he told Dohony what Brad and Poole told him, were not appellant's own statements and were inadmissible hearsay. The State responds that the evidence was not offered for its truth. We agree.

█ "An out-of-court statement is admissible if it is not being offered for the truth of the matter asserted or if it falls within one of the recognized exceptions to the hearsay rule." *Conyers v. State*, 354 Md. 132, 158, 729 A.2d 910, *cert. denied*, 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999); *see also Daniel v. State*, 132 Md.App. 576, 587–89, 753 A.2d 545 (concluding that, even assuming witness's testimony was based upon declarant's statements, the testimony that declarant was "eliminated as a suspect," did not offer declarant's statements into evidence to prove the truth of the matter asserted and were not hearsay), *cert. denied*, 361 Md. 232, 760 A.2d 1106 (2000); *Williams v. State*, 99 Md.App. 711, 725, 639 A.2d 180 (1994) (witness's recounting of a statement made by the person being arrested was nonhearsay because it was not being offered for its truth), *aff'd on other grounds*, 344 Md. 358, 686 A.2d 1096 (1996).

Professor McLain has explained:

The Rule's requirement that, in order to be hearsay, the out-of-court statement must be "offered to prove the truth of the matter asserted" is shorthand, providing a convenient code phrase for lawyers. If amplified for clarity, the phrase would read, **"offered in evidence to prove today the same truth of the matter that was asserted by the declarant at the time he or she made the out-of-court statement."** For further clarity, a definition would be added: **"An out-**

of-court statement will be considered to be offered to prove that 'truth,' only if it would have no probative value (as to the relevant fact it is offered to prove) unless the declarant was both sincere and accurate when he or she made the statement."

6A McLain, *Maryland Evidence,* § 801:1(C) at 14–15 (2d ed.2001) (emphasis in original, footnote omitted); *see also* Joseph F. Murphy, Jr., *Maryland Evidence Handbook* § 702, at 305–06 (4th ed. 2010) ("[I]f this statement is being offered to prove a fact other than truth of content, the rule against hearsay does not apply and the trial judge must now determine whether this statement should be admitted or excluded on the grounds of relevancy and materiality.").

Appellant's double hearsay argument asks us to consider the declarants in this scenario to be Brad and Poole, a/k/a "Unc." Under that contention, Brad's out-of-court statement to appellant that he was looking for a gun because "Mike, umm, killed Mark," as well as Poole's out-of-court statement that "he handled his business" were not offered to prove that those statements were, in fact, true. Rather, the statements were offered for purposes of assessing Poole's credibility. We conclude that the statements fall under the rule that "[a] witness' out-of-court statements offered not as substantive proof but for purposes of impeachment or rehabilitation of the witness' credibility are not hearsay." 6A McLain, *supra,* § 801:12 at 55. Thus, we discern neither error nor abuse of discretion in the trial court's determination to admit these statements contained within appellant's taped interview with police.

■ Moreover, we agree with the State that any error was harmless beyond a reasonable doubt. *See Bellamy v. State,* 403 Md. 308, 332, 941 A.2d 1107 (2008) (" 'Once it has been determined that error was committed, reversal is required unless the error did not influence the verdict; the error is harmless only if it did not play any role in the jury's verdict.' ") (citation omitted); *see also Hudson v. State,* 152 Md.App. 488, 509–11, 832 A.2d 834 (2003) (concluding that

admission of hearsay was harmless beyond a reasonable doubt), *cert. denied*, 378 Md. 618, 837 A.2d 928 (2003); *Clark v. State*, 140 Md.App. 540, 565, 781 A.2d 913 (2001) (error for appellate purposes "may not be predicated upon a ruling that admits or excludes evidence unless the party is prejudiced by the ruling." (citing Md. Rule 5-103(a))), *cert. denied*, 368 Md. 527, 796 A.2d 695 (2002).

As the State notes, the out-of-court statements by Brad that "Mike, umm, killed Mark," and the tacit admission by Poole that he "handled his business" actually were exculpatory as to appellant. Furthermore, the jury had already heard similar testimony, including the fact that appellant told police that Poole was the actual shooter. Poole testified that he did not know why appellant identified him as the shooter. Poole denied having a conversation with appellant about the shooting. Poole denied that he ever asked his brother, Brad, to get him a gun, or that he spoke to appellant on the phone and told him he "had handled your business ..." Thus, appellant was not prejudiced when similar testimony came in later through Dohony's discussion of portions of appellant's statement.

We also recall that the jury was instructed to consider appellant's statement only to evaluate the credibility of Michael Poole:

THE COURT: ... Now, with regard to the statement of the Defendant as introduced by or through Detective Dohony, that can be used with regard to your determination of the credibility of witness Poole who testified, but for no other reason. Those statements given by the Defendant to Detective Dohony—

Was there a stipulation with regard to that?

[PROSECUTOR]: I don't believe so.

[DEFENSE COUNSEL]: I don't believe so, Your Honor.

THE COURT: Okay.

JUROR: Your Honor, could you repeat that?

THE COURT: Yes. The statement made by the Defendant when he was arrested, I think it was a couple question and answers that were read, as introduced through Detective

Dohony, can be used with regard to your determining as to whether or not you believe or disbelieve witness Poole's testimony in open court, but can't be used for any other reason. Is that clearer? Period.

We are also not persuaded by appellant's suggestion that admission of these out-of-court statements infringed on his constitutional right "to be free from self-incrimination and put pressure on him to take the stand in his own defense." Appellant exercised his Fifth Amendment rights and declined to testify at trial after having been advised of his right to remain silent. While the record simply reflects that appellant's answer to whether he understood that right as "Mm-hmm," there is no indication in the transcript, nor does appellant argue on appeal, that his decision was anything other than knowingly, voluntarily, and intelligently made. Appellant made no assertion at trial that his decision not to testify was influenced by the court's evidentiary rulings. Moreover, the court instructed the jury that appellant had a constitutional right not to testify, and the fact that he did not testify "must not be held against the Defendant. It must not be considered by you in any way, or even discussed by you."

The jury was further instructed that the State had the burden of proving appellant's guilt beyond a reasonable doubt. In addition, and as we will discuss in more detail in the third issue presented, the evidence was more than sufficient to sustain appellant's convictions. Ultimately, any error in admitting the out-of-court statements of the declarants, Brad and Poole, via Dohony's testimony concerning appellant's interview with police, was harmless beyond a reasonable doubt.

### 2. Questions posed by jurors

Following the seating of the jury, the trial court gave preliminary instructions, including the following:

Now, there's a split of authority on whether or not you are entitled to ask questions. I'm of the opinion that you are. So if you have any question concerning the testimony while that witness is still in this room, pass me up a note.

And if the witness is up from the jury stand, I'll stop him or her if you let me know you've got a question. Say Judge, I got a question, or pass it up and I'll see you passing it up and I'll have [the law clerk] get it. Then I'll read it. If I can't ask it, if there's—because a lot of time questions are very interesting, but they have no legal value, no probative value into the issues that you're going to have to decide.

If it has no probative value, I'm not going to ask it, because if they had asked the same question, I would have sustained an objection and when that happens, the witness can't answer the question. I'm the legal umpire during the course of the trial. I call legal balls and strikes. I'm obliged to do two things during the course of the trial, and—I guess it's three really—and make sure that I explain the law to you in language that allows you to do your job.

Although, appellant did not object after the court explained this procedure, he now asserts that the court committed reversible error. During the trial, the court received questions from jurors on two occasions and put those questions to the witnesses to whom they were directed. Appellant contends that in so doing, the court violated Md. Rule 4–326, governing communications with the jury. The State responds that this issue is not preserved for our review and that any error was harmless beyond a reasonable doubt. We agree.

To put the issue in perspective, we set out the circumstances.

During David Couvillion's direct examination, and after he testified concerning his identification of appellant from a photo array, the following ensued:

THE COURT: Now, sir, what was the basis of your picking out that photograph?

THE WITNESS: The basis, the basis of this one?

THE COURT: Yes, sir.

THE WITNESS: My recollection of, of how I saw Mr. Handy run by the ambulance and, you know, tryin', and rememberin' how I saw him and then looking at this array

and seeing the person that looked like, looked like the guy that ran past the ambulance.

THE COURT: And sir, what effect, if any, did the fact that he had cornrows in that photographs have on your determination of whether or not to pick out that photograph?

THE WITNESS: Well, I have to say, of course, it was part of the, the whole picture, but the facial expression, the, it looks like the, the overall body size, just the face in general, the complexion, that taken into account as a whole, including the cornrows is what—

**THE COURT: Okay. That was a juror's question.**

There was no objection by appellant to this questioning. Later, at the conclusion of Couvillion's direct examination, the following occurred:

THE COURT: Sir, when you saw, were you able, saw the shooting, were you able to look directly at the shooter's face?

THE WITNESS: Yes. Yes, sir.

THE COURT: Is that as he ran by you?

THE WITNESS: Well, they were, when he started the shooting and then as he ran by, the, as he ran by was, he wasn't looking at the medic unit, but he was, you know, at a slight angle maybe looking down, but I had a good view of his face. The time when I saw his face fully as closely as it would represent the mug shot was when he came from the left side of Mr. Jones and started shooting, and then started running past us.

**THE COURT: All right. That was a juror's question.**

Again, defense counsel raised no objection.

### *Preservation*

■ "In accordance with Rule 8–131, ordinarily [the appellate court] will not consider any point or question not plainly raised or decided by the trial court." *Fitzgerald v. State*, 384 Md. 484, 505, 864 A.2d 1006 (2004). Further, the purposes of Rule 8–131 are:

"(a) to require counsel to bring the position of their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings, and (b) to prevent the trial of cases in a piecemeal fashion, thus accelerating the termination of litigation."

*Fitzgerald,* 384 Md. at 505, 864 A.2d 1006 (2004) (quoting *County Council v. Offen,* 334 Md. 499, 509, 639 A.2d 1070 (1994)); *accord Robinson v. State,* 404 Md. 208, 216–17, 946 A.2d 456 (2008); *see also Malarkey v. State,* 188 Md.App. 126, 157, 981 A.2d 675 (2009) ("The trial court cannot correct errors of which it is not informed.").

Both the Court of Appeals and this Court have held that Md. Rule 4–326 is subject to the rules of preservation. *See Miles v. State,* 365 Md. 488, 542, 781 A.2d 787 (2001) (considering whether a claimed violation of Md. Rule 4–326 is preserved under Md. Rule 8–131(a)), *cert. denied,* 534 U.S. 1163, 122 S.Ct. 1175, 152 L.Ed.2d 118 (2002); *Graham v. State,* 325 Md. 398, 411, 601 A.2d 131 (1992) (holding that failure to object to a violation of Md. Rule 4–326 was not preserved); *Wagner v. State,* 160 Md.App. 531, 559, 864 A.2d 1037 (2005) (stating "a violation of Rule 4–326(c) does not require reversal if the issue was not preserved for appeal or the error was harmless.").

■ Other courts have also concluded that an absence of objection to a question proposed by the jury waives the issue on appeal. *See United States v. Cassiere,* 4 F.3d 1006, 1018 (1st Cir.1993) (declining to find plain error where defendant did not object to court's decision to ask four juror questions); *DeBenedetto v. Goodyear Tire & Rubber Co.,* 754 F.2d 512, 517 (4th Cir.1985) (finding no error where there was no prejudice to either party and because appellants did not object to the procedure permitting the jury to ask questions of witnesses); *Matchett v. State,* 257 Ga. 785, 364 S.E.2d 565, 567 (1988) (concluding that while questions directly from a juror to a witness are generally not permitted in Georgia, appellant's failure to object waived the issue); *State v. Munoz,* 67 Wash. App. 533, 837 P.2d 636, 638–40 (1992) (ruling that appellant's

due process challenge to jurors questioning of witnesses was not preserved), *review denied,* 120 Wash.2d 1024, 844 P.2d 1018 (1993). Accordingly, by failing to object to either the procedure of asking questions submitted by the jury, and by failing to object at any time when the court did ask such questions, appellant waived this issue.

While appellant does not ask us to exercise plain error review, even if the issue was properly before us, we agree with the State that appellant was not prejudiced by the trial court's procedure or the questions asked of David Couvillion.

Maryland Rule 4–326(d) provides:

> The court shall notify the defendant and the State's Attorney of the receipt of any communication from the jury pertaining to the action before responding to the communication. All such communications between the court and the jury shall be on the record in open court or shall be in writing and filed in the action. The clerk or the court shall note on a written communication the date and time it was received from the jury.

The purpose of this rule is based on the following:

> [A]n accused in a criminal prosecution has the absolute right to be present at every stage of trial from the time the jury is impaneled until it reaches a verdict or is discharged, and that includes the right to be present "when there shall be any communication whatsoever between the court and the jury[,] *unless* the record affirmatively shows that such communications were not prejudicial or had no tendency to influence the verdict of the jury."

*Denicolis v. State,* 378 Md. 646, 656, 837 A.2d 944 (2003) (emphasis in original, citation omitted).

Appellant contends the court violated this rule because it failed to "(1) notify the parties of the receipt of the communications from the jury, (2) consult with counsel, (3) respond to the inquiry, and (4) place any communication between the court and the jury on the record in compliance with this Rule."

Initially, appellant appears to suggest that the notes were not included in the record. While the notes are not time-stamped in accordance with Md. Rule 4–326(d), they are contained in the record on appeal.

■ The first note provides:

Can we ask the officer if the primary basis for his ID of the suspect in the photo line up was the cornrow hair style.

The second note asks:

Did you Mr. [Couvillion] make any eye to eye contact or were [you] able to look directly at the defendants face as he ran by you. # 6.

We conclude that the juror questions were "communications," as contemplated by Rule 4–326(d), because there is nothing in the rule that indicates that its application is limited to jury notes received during deliberations, or recesses. Indeed, an earlier amendment to the predecessor rule, Md. Rule 758(d), deleted the preliminary phrase "[a]fter the jury has retired to deliberate . . .," thus clearly suggesting that the rule is not limited to communications during deliberations.[6]

Our conclusion comports with *Perez and Canela v. State,* 420 Md. 57, 21 A.3d 1048 (2011). The issue before the Court in *Perez and Canela* was whether the trial court's error in failing to disclose to defense counsel several notes that had been sent from the jury to the court was reversible error.[7] In that context, the Court applied and considered Md. Rule 4–326(d) and clearly extended the scope of the Rule to apply to

---

**6.** Prior to July 1, 1977, the predecessor rule, Rule 758(d), provided as follows: "After the jury has retired to deliberate, all communications between it and the court shall be made on the record in open court or shall be in writing and filed in the case." Pursuant to the 53rd Report of the Standing Committee on Rules of Practice and Procedure, that subsection was changed to: "The court shall notify the defendant and the State's Attorney of the receipt of any communication from the jury pertaining to the case. All communications between the court and the jury shall be made on the record in open court, or shall be in writing and filed in the case."

**7.** That the trial court erred in not disclosing the notes was not contested.

all jury-to-court communications. While the Court did not state with specificity that the rule applies to all such communications, we draw our conclusion because the communications were in the form of notes that, in some instances, were passed from the jury to the court in open court, and not during recesses or deliberations. The Court recounted that "although most of the notes in question were directed to the witnesses by the judge, this did not relieve the court of its obligation to inform both parties that the communications originated with the jurors and the substance thereof, pertaining to non-collateral issues, prior to any response by the court." 420 Md. at 77, 21 A.3d 1048 (footnote omitted).

In the instant case, while the juror's questions are in writing and have been included in the record on appeal, it does not appear that the court shared them with counsel or consulted with counsel before asking certain questions. To the extent that this aspect of Rule 4–326 was not followed, any error, as we have noted, is offset by counsel's failure to object to the court's procedure of permitting juror questioning, as well as the lack of objection when the questions were asked of the witnesses. Moreover, as appellant recognizes, he was present in the courtroom when the questions were asked. Therefore, this is not a case where the defendant was not present when the communication occurred. *See Denicolis,* 378 Md. at 656, 837 A.2d 944 ("[A]n accused in a criminal prosecution has the absolute right to be present at every stage of trial from the time the jury is impaneled until it reaches a verdict or is discharged . . .").

We are equally satisfied that Rule 4–326 encompasses questions generated by jurors and directed to a witness, as is now before us, as well as questions generated by jurors and directed to the presiding judge, as in *Perez and Canela.* In each case the genesis of the questions was at a different level. In *Perez and Canela,* the jury, in several of the notes, was clearly seeking advice from the court; in this case the jury was seeking an answer from a witness then on the stand. The judge in *Perez and Canela,* rather than relying on his own

recollection, posed the question to the witness, as the juror had requested.

The courtroom events in the instant case and the events that gave rise to the assertions of error in *Perez and Canela*, are somewhat inapposite, as we have noted above, in both the origin of the notes and the basis of information sought by the jury, that is from witnesses, in this case, rather from the court in *Perez and Canela*. While a distinction, *vis-a-vis* application of Rule 4–326, might be argued, we see none and conclude that, in either circumstance, there exists a communication that falls within the ambit of the Rule. We find nothing in the Court's opinion in *Perez and Canela* that would support application of the rule in one instance, but not in the other.[8]

We turn, then, to appellant's assertion that the court failed to comply with Md. Rule 4–326 by failing to disclose the jury notes to counsel.

 We begin with the awareness that a "failure to provide an opportunity for inspection in order to develop an appropriate response may provide the basis for an error." *Miles v. State*, 365 Md. 488, 544, 781 A.2d 787 (2001) (communication from the jury during deliberations.).

From the outset, the parties were aware that the court would invite jurors to submit questions to witnesses while the witnesses were still available and under oath. The court announced its plan to the jury, in open court, after the jury had been selected and seated. There was neither question nor objection from counsel. As we have noted, on two occasions a juror submitted a question. In each case, the question was written by the juror, delivered to the clerk, in open court, and delivered by the clerk to the presiding judge. In each instance, after reading the question to the witness, the court announced: "that was a juror's question." Neither the State, nor the defense, sought further elaboration from the witness

---

8. We note that in the instant case, the notes were disclosed to counsel, albeit too late for objection, while in *Perez and Canela* the notes were not disclosed.

following those questions and the witness's answer. We are satisfied, on this record, that there was neither failure by the court to respond to the juror communication, nor failure to make the parties aware of the communication. We reiterate that, despite the court's failure to fully comply with Md. Rule 4–326, the error is obviated by appellant's failure to preserve the issue.

### Jurors' Questions to Witnesses

We shall next consider whether the court erred in engaging in the process of permitting jurors to submit questions.

 We begin by recognizing that a judge may question witnesses during a trial. *See* Md. Rule 5–614(b) ("The court may interrogate any witness. In jury trials the court's questioning must be cautiously guarded so as not to comment on the evidence or convey the court's opinion of the witness's credibility."); *see also Diggs v. State,* 409 Md. 260, 292, 973 A.2d 796 (2009) ("[W]hile we agree with the court below that a judge presiding over a jury trial has the right to interrogate witnesses in an effort to clarify the issues, we stress that he should exercise this right sparingly.") (citation omitted). The purpose of allowing such questions is to insure that the facts of the case are fully developed. *Nance v. State,* 77 Md.App. 259, 263, 549 A.2d 1182 (1988), *cert. denied,* 314 Md. 629, 552 A.2d 894 (1989). Thus, where the court's questioning is "a legitimate effort to sharpen issues and clarify difficult points for the jury," it will be upheld. *See Pearlstein v. State,* 76 Md.App. 507, 515, 547 A.2d 645 (1988), *cert. denied,* 314 Md. 497, 551 A.2d 867 (1989).[9]

Notwithstanding this established principle, it appears that the issue whether jurors may also question witnesses, or rather, as in this case, whether a trial court may ask a witness a question proposed by the jury, is an issue of first impression

---

9. In its jury instructions, the court told the jury not to "draw any inference or conclusion from any comments or questions that I may have made or stated, either as to the merits of the case or as to my views regarding any witness."

in Maryland. Nonetheless, as we shall discuss, it is a practice that is developing in both federal and state court jurisprudence. Hence, we believe the subject to be worthy of discussion.

The majority of federal courts to address the issue have held that whether to permit juror questioning is a matter of trial court discretion. *See United States v. Rawlings,* 522 F.3d 403, 407 (D.C.Cir.2008) (observing that "at least ten circuits had considered the issue and concluded that juror questions are within the trial judge's discretion"); *United States v. Richardson,* 233 F.3d 1285, 1290 (11th Cir.2000) (opining that when considering whether to permit juror questioning, the court should weigh the potential benefits to the jurors against the potential harm to the parties), *cert. denied,* 532 U.S. 913, 121 S.Ct. 1245, 149 L.Ed.2d 152 (2001); *United States v. Collins,* 226 F.3d 457, 465 (6th Cir.2000) (upholding district court's decision to allow juror questioning under the circumstances of the case); *United States v. Hernandez,* 176 F.3d 719, 723 (3d Cir.1999) (approving juror questioning of witnesses "so long as it is done in a manner that insures the fairness of the proceedings, the primacy of the court's stewardship, and the rights of the accused"); *United States v. Bush,* 47 F.3d 511, 514 (2d Cir.1995) (holding that questioning by jurors is a matter within the court's discretion); *United States v. Groene,* 998 F.2d 604, 606 (8th Cir.1993) (permitting juror questions, but cautioning that courts should consider using a procedure that requires the questions to be in writing and out of the hearing of, and without discussion with, other jurors), *cert. denied,* 510 U.S. 1072, 114 S.Ct. 881, 127 L.Ed.2d 76 (1994); *DeBenedetto v. Goodyear Tire & Rubber Co.,* 754 F.2d at 516–17 (concluding that while juror questioning and questioning by the trial judge are distinguishable, and observing that juror questioning is "a course fraught with peril," both forms of questioning are left to trial court discretion).

The majority of state courts that have considered the question have also held that the practice is left to the sound discretion of the trial court. Some of these courts have also suggested that that discretion be exercised pursuant to certain

procedural safeguards. *See Ex parte Malone,* 12 So.3d 60, 65 (Ala.2008) (holding that it is within discretion of trial court to allow jurors to question witnesses); *Landt v. State,* 87 P.3d 73, 80 (Alaska Ct.App.2004) (concluding that trial court's procedure for permitting jurors to propose questions in writing for witnesses was not an abuse of discretion); *State v. Greer,* 190 Ariz. 378, 948 P.2d 995, 997 (Ariz.Ct.App.1997) (holding that Arizona rule of criminal procedure permitting written questions from the jury was not unconstitutional); *Plummer v. United States,* 870 A.2d 539, 543 (D.C.2005) (finding no abuse of discretion in trial court's decision to permit jurors to submit written questions to witnesses); *State v. Culkin,* 97 Hawai'i 206, 35 P.3d 233, 252–55 (2001) (observing that all federal courts of appeal and a majority of state courts permit juror questioning, but recognizing that some courts only permit juror questioning of witnesses only where procedural safeguards are employed); *State v. Hays,* 256 Kan. 48, 883 P.2d 1093, 1102 (1994) (permitting the practice of juror questioning subject to certain procedures); *Tyson v. State,* 270 Ind. 458, 386 N.E.2d 1185, 1192 (1979) (recognizing that jurors may propound questions to a witness, "subject to proper regulation by the trial court"); *Commonwealth v. Britto,* 433 Mass. 596, 744 N.E.2d 1089, 1105–06 (2001) (permitting juror questions subject to detailed procedures); *State v. Graves,* 274 Mont. 264, 907 P.2d 963, 967 (1995) (permitting jurors to ask questions of witnesses, provided: (1) questions are factual and not adversarial; (2) questions are in writing; (3) counsel should be given a chance to object; (4) the judge reads the question; and, (5) counsel should be allowed to ask follow-up questions); *Flores v. State,* 114 Nev. 910, 965 P.2d 901, 902–03 (1998) (holding that juror questioning is a matter of trial court discretion and proposing numerous safeguards, including informing the jury that only questions permissible under the rules of evidence are permitted and that the jury should not place undue weight on the responses to their questions); *State v. Jumpp,* 261 N.J.Super. 514, 619 A.2d 602, 613 (N.J.Ct.App. 1993) (finding that appellant was not prejudiced by one juror question of a witness and that any error was harmless, but

also declining to hold that juror questioning is permitted in New Jersey), *cert. denied,* 134 N.J. 474, 634 A.2d 522 (1993); *State v. Rodriguez,* 107 N.M. 611, 762 P.2d 898, 901 (N.M.Ct. App.1988) (submitting juror questions to witnesses entrusted to trial court discretion), *cert. denied,* 107 N.M. 546, 761 P.2d 424 (1988); *State v. Fisher,* 99 Ohio St.3d 127, 789 N.E.2d 222, 229 (2003) (holding that juror questioning is left to the discretion of the trial court, and providing procedural safeguards for such a practice); *Day v. Kilgore,* 314 S.C. 365, 444 S.E.2d 515, 518–19 (1994) (while questions from jury are a matter of discretion, permitting the practice will constitute an abuse of discretion if certain procedures are not strictly adhered to by the court); *State v. Doleszny,* 176 Vt. 203, 844 A.2d 773, 785 (2004) (permitting juror questioning of witnesses pursuant to certain safeguards, and noting that "[a]ctive jurors, like active students, are more likely to learn and will thereby become more precise and qualified decision makers"); *Williams v. Commonwealth,* 24 Va.App. 577, 484 S.E.2d 153, 155 (1997) (trial courts may permit jurors to submit written questions of a witness where procedural safeguards are followed); *Cathcart v. State Farm Mut. Auto. Ins. Co.,* 123 P.3d 579, 595 (Wyo.2005) (in a case involving the interpretation of rule of civil procedure permitting juror questions, the Court observes that "Wyoming is among the majority of states that allow juror questioning").

A number of journals and law reviews are also in support of permitting questioning from jurors. *See* Valen, *Jurors Asking Questions: Revolutionary or Evolutionary?,* 20 N. Ky. L.Rev. 423 (1993) (contending that permitting jurors to ask questions furthers the goals of resolving disputes and ascertaining the truth, and also suggesting an instruction informing that procedure); Frankel, *Legal Institutions: a Trial Judge's Perspective on Providing Tools for Rational Jury Decisionmaking,* 85 Nw. U.L.Rev. 221, 225 (1990) (suggesting that preliminary instruction, notetaking, and jury questioning "enhances the rational aspects of the jury's fact-finding role"); L. Sand & S. Reiss, *A Report on Seven Experiments Conducted by District Court Judges in the Second Circuit,* 60 N.Y.U. L.Rev. 423, 444

(1985) (finds that jurors who ask questions may be more attentive and may feel a greater sense of responsibility in the trial); L. Heuer & S. Penrod, *Increasing Juror Participation in Trials Through Note Taking and Question Asking,* 79 Judicature 256, 259–62 (1996) (concluding that studies indicate that: juror questioning helps jurors understand the facts and issues being presented; the benefits of such questioning remains unclear; and, the findings do not support critiques emphasizing potential harmful consequences); Purver, *Propriety of Jurors Asking Questions in Open Court During Course of Trial,* 31 A.L.R.3d 872 (1970) (collecting cases). *See also* G. Thomas Munsterman, Paula L. Hannaford & Marc Whitehead, *Jury Trial Innovations,* 1997, National Center for State Courts.[10]

In contrast, a few courts have held that juror questioning of witnesses amounts to error or an abuse of discretion. *See United States v. Ajmal,* 67 F.3d 12, 14–15 (2d Cir.1995) (holding that, while juror questioning is permissible, trial court's encouragement of juror questioning was an abuse of discretion); *State v. Costello,* 646 N.W.2d 204, 215 (Minn.2002) (holding that juror questioning is not permitted in criminal trials and is not subject to harmless error); *Morrison v. State,* 845 S.W.2d 882, 889 (Tex.Crim.App.1992) (juror questioning of witnesses is prohibited and is not subject to harmless error); *see also Wharton v. State,* 734 So.2d 985, 990 (Miss.1998) (although juror questioning may be harmless error, it is "condemned and outright forbidden by this Court"); *State v. Zima,* 237 Neb. 952, 468 N.W.2d 377, 380 (1991) (although affirming because appellant invited any error, the court held that juror questioning of witnesses is prohibited); Lundy, *NOTE: Juror Questioning of Witnesses: Questioning the*

---

**10.** In September 1998, the Council on Jury Use and Management was created by the Maryland Conference of Circuit Court Judges. The Council's study is the most comprehensive study of jury matters undertaken in Maryland to date. The Council filed a report with the Conference on April 12, 2000. Among the reforms proposed by the Council was that "jurors should be allowed to pose questions for witnesses under controlled circumstances." Indeed, it appears that some Maryland trial judges have been permitting such questioning.

*United States Criminal Justice System,* 85 Minn. L.Rev.2007 (2001) (arguing against permitting questioning by jurors in criminal trials); Berkowitz, *NOTE: Breaking the Silence: Should Jurors Be Allowed to Question Witnesses During Trial?,* 44 Vand. L.Rev. 117 (1991) (contending that the risks associated with juror questioning outweigh the advantages).

It is noteworthy that, of the courts that do allow juror questioning of witnesses, many suggest procedures a trial court should use in such circumstances. Typical of such procedures is the following from the Kansas Supreme Court:

> Trial courts which permit jurors to submit questions to witnesses should maintain strict control and should adhere to certain safeguards to minimize the risks associated with the practice. The trial court should not solicit questions and should only permit them for purposes of clarification. The testimony of a witness should not be interrupted by questions from jurors. Jurors should submit questions in writing and without any discussion with other jurors. Counsel should be afforded the opportunity to object outside the presence of the jury. The trial court must determine the relevancy of the questions. The trial court should instruct the jury not to draw any inference if a question submitted is not asked. The trial judge, rather than counsel or jurors, should question the witness. Finally, counsel should be given the right to further examine the witness following the jury's questions.

*State v. Hays,* 883 P.2d at 1102. Trial judges who permit juror questioning would do well to consider the safeguards suggested by the *Hays* court.

*See also Commonwealth v. Britto,* 744 N.E.2d at 1105–06 (offering detailed procedures including how the jury should be instructed on such a procedure); Neff, *Comment: The Propriety of Jury Questioning: A Remedy for Perceived Harmless Error,* 28 Pepp. L.Rev. 437, 468–69 (2001) (proposing a rule of evidence or criminal procedure with respect to juror questioning of witnesses to lessen the prejudicial effect of such questions on a criminal defendant); 81 Am.Jur.2d Witnesses § 705

(2004) (suggesting procedural safeguards for posing questions from jurors).

■■■ With these principles in mind, we conclude that appellant was not prejudiced when the court asked Couvillion the two questions proposed by the jury. Although full compliance with Md. Rule 4–326 required the court to share the questions with counsel prior to asking them, thereby giving counsel an opportunity to place any objections on the record, the questions asked merely clarified Couvillion's prior testimony concerning his identification of appellant as the shooter in this case and did not introduce any new evidence into the trial.

Couvillion testified that he saw appellant run past the ambulance, and that, at the time of the shooting, he had cornrows in his hair. Couvillion also said that he subsequently identified appellant's photograph from a photo array, qualifying that identification by indicating that, "[a]s best as my recollection serves me," the photograph "closely resembles" the person he saw shooting the victim. While Couvillion testified at trial that he did not have any doubt that the photograph was the person who shot the victim, the juror's first question about the basis of the identification, and the effect of certain hairstyles in the photo array, sought only to clarify details of Couvillion's identification. Because the juror's question court simply sought to clarify, it was not prejudicial.

Couvillion also testified that he observed appellant for approximately ten seconds from the moment of the shooting until appellant ran past the medic unit and up the street. The second juror question, concerning whether Couvillion actually looked at appellant's face, sought clarification of Couvillion's observations and his identification. Had these questions originated from the trial judge, we would have no difficulty concluding that they were legitimate efforts to sharpen and clarify the issues before the fact finder. We will not come to a different conclusion simply because the question was proposed by a juror.

Thus, had appellant's challenge to the juror question procedure been preserved, we would conclude that appellant was not prejudiced by the questioning.[11]

In sum, we find no prohibition of a process by which jurors may post questions to witnesses, albeit under carefully developed, explained, and monitored procedures consistent with Md. Rule 4–326. Ultimately, such a process is within the sound discretion of the trial court, a discretion that is to be carefully exercised. It is paramount that jurors not be permitted to be partisans for either party. While we assign the process to the discretion of the trial court, we caution that juror questioning is a procedure that may be best left to the more complex or protracted litigation, as opposed to garden variety, everyday trials. In reaching that conclusion we do not suggest that some trials are less significant than others; indeed, to the parties there is no such event as "a little case in the circuit court."

In the exercise of sound discretion, trial courts should develop, and explain, a detailed procedure for juror questioning. At minimum, the court's intent to engage the process should be explained to counsel in advance and allow counsels' comments or concerns. The process should be explained to the seated jury with a caution that questions, if submitted, must be offered while the witness remains on the stand. The court should also explain to the jury that not all questions will be asked and, further, that questions are subject to objection by counsel and must seek only evidence admissible under the rules of evidence. Questions must be shared with counsel before being asked, giving counsel the opportunity to pose objections. When a juror's question is asked, counsel must be afforded the opportunity to ask follow-up questions. Finally,

---

11. As we have observed, it is noteworthy that defense counsel made no objection and sought no relief from the court. That said, we appreciate that counsel, who had been able to impeach several of the eyewitness's to some extent, might have been satisfied with the progress of the trial to that time and would not have thought a mistrial to be in appellant's best interest.

in the exercise of discretion, the court may terminate the process should there be any appearance of impropriety or partisanship.[12]

### 3. Sufficiency of the evidence

Finally, appellant contends that the evidence was insufficient to sustain his convictions because the witnesses' identification of him was unreliable and because there was insufficient proof of premeditation. We are not persuaded.

In deciding any claim relating to the sufficiency of the evidence, the appropriate inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *accord State v. Smith*, 374 Md. 527, 533, 823 A.2d 664 (2003). *"[A]ll of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781 (footnote omitted); *accord Bible v. State*, 411 Md. 138, 156, 982 A.2d 348 (2009).

A purpose of this rule is to give "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781. Further, "[a] valid conviction may be based solely on circumstantial evidence." *Smith*, 374 Md. at 534, 823 A.2d 664. Additionally, "[w]eighing the credibility of witnesses and resolving conflicts in the evidence are tasks proper for the fact finder." *Id.* at 533–34, 823 A.2d 664; *see also Bible*, 411 Md. at 156, 982 A.2d 348 (stating "[the appellate court] must give deference to all reasonable inferences [that]

---

12. In the development of this opinion, we have considered the observations of several courts that have set out suggested guidelines and procedures for juror questioning. Among those opinions that we commend to trial judges are: *State v. Hays*, 256 Kan. 48, 883 P.2d 1093 (1994); *Commonwealth v. Britto*, 433 Mass. 596, 744 N.E.2d 1089 (2001); *Flores v. State*, 114 Nev. 910, 965 P.2d 901 (1998); and *State v. Doleszny*, 176 Vt. 203, 844 A.2d 773 (2004).

the fact-finder draws, regardless of whether [the appellate court] would have chosen a different reasonable inference." (citation omitted)); *Sifrit v. State*, 383 Md. 116, 135, 857 A.2d 88 (2004) (the jury is "free to believe some, all, or none of the evidence presented.").

### *Identification*

■ It is well settled that the evidence of a single eyewitness is sufficient to sustain a conviction. *See Branch v. State*, 305 Md. 177, 184, 502 A.2d 496 (1986) ("The issue of credibility, of course, is one for the trier of fact.").

■ In this case, there was not just one eyewitness, but three. Duvalle Johnson identified appellant in court as the person she saw shoot Mark Jones multiple times. David Couvillion also saw appellant shoot Jones, and he identified appellant both in court and in a photo array. Couvillion further testified that he saw appellant for approximately ten seconds during the incident and that he saw his face as appellant ran past the medic unit. Theresa Manley identified appellant in court and in a photo array as the person she saw shoot Jones. While Manley's recollection of whether the shooter was in a car or on foot was an issue for the jury, Manley, like Couvillion, maintained that she saw appellant's face as he ran across the street after the shooting.

In addition to these eyewitnesses to the shooting, Kanakia Feagins encountered appellant on the street several days after the shooting. At that time appellant told Feagins that he shot someone three times in the back in broad daylight. Feagins identified a photograph of appellant in a photo array.

■ While appellant maintains that these witnesses were unreliable, it is settled that "[w]eighing the credibility of witnesses and resolving conflicts in the evidence are tasks proper for the fact finder." *State v. Stanley*, 351 Md. 733, 750, 720 A.2d 323 (1998) (citing *Binnie v. State*, 321 Md. 572, 580, 583 A.2d 1037 (1991)); *accord State v. Smith*, 374 Md. at 533–34, 823 A.2d 664; *see also Kamara v. State*, 184 Md.App. 59, 79, 964 A.2d 244 ("The credibility of the witnesses at trial is of

course for the trier of fact[, and] the trier of fact is under no obligation to believe even uncontradicted explanations or denials of an accused.") (citation omitted), *cert. denied,* 409 Md. 45, 972 A.2d 860 (2009). There was sufficient evidence of appellant's criminal agency in this case.

### *Premeditation*

■ Next, as to appellant's argument that there was insufficient evidence of premeditation, murder in the first degree can be established by evidence that the death was "a deliberate, premeditated, and willful killing." *See* Md.Code Ann., Crim. Law, § 2–201(a) (2002). In *Mitchell v. State,* 363 Md. 130, 767 A.2d 844 (2001), the Court of Appeals stated:

> For murder "to be 'deliberate' there must be a full and conscious knowledge of the purpose to kill; and to be 'premeditated' the design to kill must have preceded the killing by an appreciable length of time, that is, time enough to be deliberate." ... [H]owever, ... "[i]t is unnecessary that the deliberation or premeditation shall have existed for any particular length of time." "Appreciable length of time" simply means "any amount of time sufficient to convince the trier of fact that the purpose to kill was not 'the immediate offspring of rashness and impetuous temper,' but was the product of a mind 'fully conscious of its own design.'" [Further]: "[i]f the killing results from a *choice made as the result of thought, however short the struggle between the intention and the act,* it is sufficient to characterize the crime as deliberate and premeditated murder." Indeed, a delay between firing a first and second shot "is enough time for reflection and decision to justify a finding of premeditation."

*Id.* at 148–49, 767 A.2d 844 (internal citations omitted, emphasis in original).

■ Intent and premeditation typically must be inferred from the facts and surrounding circumstances. *See Burch v. State,* 346 Md. 253, 273, 696 A.2d 443 (1997) ("An intent to kill often must be proved by circumstantial evidence and found by

inference. Absent an admission by the accused, it rarely can be proved directly."), *cert. denied,* 522 U.S. 1001, 118 S.Ct. 571, 139 L.Ed.2d 410 (1997); *see also Hagez v. State,* 110 Md.App. 194, 206, 676 A.2d 992 (1996) ("Ordinarily, premeditation is not established by direct evidence. Rather, it is usually inferred from the facts and surrounding circumstances.").

There was ample evidence that appellant fired multiple times at Jones. According to Johnson, who was only 15 feet away from the shooting, she saw the first shot fired by appellant and then heard the remaining four or five shots. Couvillion testified that he heard five shots and that he actually saw a black handgun being fired. Jones died of multiple gunshot wounds. The evidence of multiple shots, fired at the victim while he was being pursued by the shooter, therefore, was sufficient to permit the jury to find premeditation.

In addition, that the murder was deliberate was corroborated by Feagins's testimony concerning her encounter with appellant several days after the murder. At that time, appellant had a handgun in his hand and was yelling that "[h]e was going to teach people about messin' with his family...." Admitting that he shot a person three times, appellant also stated that he was going to "kill the rest of 'em."

Finally, both Johnson and Couvillion testified that, after the shooting, appellant ran northbound away from the scene. Flight from the scene of a crime suggests a consciousness of guilt. *See Snyder v. State,* 361 Md. 580, 593, 762 A.2d 125 (2000). (circumstantial evidence of defendant's conduct may be admissible to show consciousness of guilt); *see also Thomas v. State,* 372 Md. 342, 351, 812 A.2d 1050 (2002) ("conduct typically argued to show consciousness of guilt includes flight after a crime, escape from confinement, use of a false name, and destruction of evidence."). This state of mind was circumstantial evidence suggesting that the killing was deliberate, premeditated, and willful. Accordingly, the evidence was sufficient to sustain appellant's convictions.

JUDGMENTS OF THE CIRCUIT COURT FOR BALTI-
MORE CITY AFFIRMED; COSTS ASSESSED TO AP-
PELLANT.